

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-16-1994

# Spain v. Gallegos

Precedential or Non-Precedential:

Docket 93-3467

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Spain v. Gallegos" (1994). *1994 Decisions.* Paper 50.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/50

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-3467


ELLEN V. SPAIN,

                              Appellant

              v.

       TONY E. GALLEGOS, CHAIRMAN,
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION;
         UNITED STATES OF AMERICA


On Appeal from the United States District Court
    for the Western District of Pennsylvania
          (D.C. Civil No. 92-1403)


          Argued May 2, 1994

  BEFORE:  GREENBERG and GARTH, Circuit Judges,
         and ROBRENO, District Judge*

       (Filed:  June 16, 1994)


                         Stanford A. Segal (argued)
                         Gatz, Cohen, Segal & Koerner
                         400 Law & Finance Building
                         Pittsburgh, PA 15219

                            Attorneys for Appellant


                         James R. Neely, Jr.
                         Deputy General Counsel
                         Gwendolyn Young Reams
                         Associate General Counsel
                         Lorraine C. Davis
                         Assistant General Counsel

1

*Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

John F. Suhre (argued)
Attorney
Equal Employment Opportunity
Commission
1801 L Street, N.W.
Washington, D.C. 20507

Attorneys for Appellee


OPINION OF THE COURT


GREENBERG, Circuit Judge.

A female employee of the Equal Employment Opportunity Commission brings this appeal from orders of the district court dismissing her action against the EEOC alleging sexual and racial discrimination, sexual harassment and unlawful retaliation, all in violation of Title VII of the Civil Rights Act of 1964. Immediately before the trial, the district court excluded certain evidence from the appellant's sexual discrimination and harassment claims and barred her from proceeding with those claims on the evidence she had intended to offer. Four days later, after an intervening weekend, the appellant elected not to proceed with the balance of her case, as she reasoned that the district court's ruling precluded her from establishing her remaining claims. In accordance with warnings the district court had given the appellant, the court then dismissed her case with prejudice for failure to prosecute, and it assessed her with jury costs.

The appellant appeals from the district court's exclusion of the evidence she intended to offer to prove sexual

3

discrimination and harassment, from the court's judgment against her on those claims on the basis of her proposed evidence, from the court's dismissal of the balance of her case predicated on her decision not to go forward, and from the court's imposition of jury costs against her. We conclude that in the unusual circumstances presented in her allegations, the appellant has alleged a prima facie case of sexual discrimination and harassment and that material issues of fact remain on these claims for consideration by a jury. We also conclude that the court abused its discretion in excluding her evidence. Consequently, we hold that the district court erred in barring her from proceeding with her sexual discrimination and harassment claims.

We also hold that the court did not abuse its discretion in dismissing the balance of her case after she decided not to go forward with her remaining claims, as it warned her that it would dismiss these claims if she did not proceed. However, in light of the significant impact of the court's initial rulings on the appellant's case and the short interval between these rulings and the start of trial on the remaining issues, we hold that the court abused its discretion in assessing the jury costs against her. Thus, we will reverse the order of the district court dismissing the appellant's sexual discrimination and harassment claims and assessing the jury costs against her, but we will affirm the order of the district court dismissing the balance of the case.

4

## I. BACKGROUND

The appellant, Ellen V. Spain, is an investigator in the Pittsburgh Area Office of the EEOC.[0]  Although she was hired in 1974 by that office, the EEOC promoted her to the position of director of the Dayton Area Office in 1979, and she held that position until approximately 1980 or 1981.  She then worked briefly for the Department of Housing and Urban Development before returning to the EEOC's Pittsburgh office as an investigator.  App. at 75.  Spain currently holds a position with a GS 1810-12, Step 10 Grade.[0]

In addition to suing the EEOC, Spain originally named Eugene Nelson and Johnny Butler as defendants, but they have been dismissed from the action.  Nelson and Butler are the director of the EEOC's Pittsburgh Area Office and the director of the EEOC's

---

[0]The EEOC points out that much of Spain's brief "is devoted to discussion of matter which was not before the district court." Appellee's br. at 3 n.1.  Thus, Spain has included depositions in the appendix not presented to the district court.  We recognize that ordinarily this procedure could present a problem, as Spain would be expanding the record on appeal.  But in the circumstances of this case, we will consider the affidavits and depositions in the appendix because the district court entered judgment for the EEOC on the sexual discrimination and harassment claims in a proceeding equivalent to a hearing on a motion for summary judgment.  However, the court did so without advance notice to Spain of the proposed hearing.  Thus, Spain had no opportunity to respond to a formal motion by filing answering papers attaching germane portions of affidavits and depositions. Accordingly, fairness requires that we treat the disposition of the sexual discrimination and harassment claims as the functional equivalent of the granting of a motion for summary judgment for the EEOC, and furthermore that we consider all the materials which Spain could have produced in opposition to that motion if given the opportunity.

[0]Id. at 2.  In the course of this opinion, we refer both to GS and GM level positions in accordance with the parties' briefs.

5

Philadelphia District Office, respectively. Therefore, Butler is Nelson's superior, and Nelson is Spain's superior. Spain does not challenge the dismissal of the action as to Nelson and Butler.

Spain, a white female, alleges that Nelson and Butler, male African-Americans, have a history of passing over her for promotions to GM-13 and GM-14 level positions in favor of allegedly lesser qualified male African-American applicants. Id. at 2-3. It is undisputed that in 1985, while Spain held a GS-11 position, she unsuccessfully applied for an open GS-12 position, a rejection that led her to file an internal EEOC complaint alleging sexual and racial discrimination. Id. at 75-76. Spain asserts that the events which underlie the present action began shortly after she filed that complaint.

Spain alleges that Nelson, her superior, induced her not to proceed with the EEOC complaint by promising that she would receive the next available promotion, so long as she agreed to lend him money periodically.[0] Spain asserts that because Nelson intimidated her she agreed to his requests, and she did obtain the next promotion in early 1986. Id. Spain charges that Nelson began demanding loans at that time and that he repeated these demands every four to eight weeks over the next few years. Id. at 76, 241; appellant's br. at 5. Significantly, EEOC regulations preclude a superior EEOC official from soliciting and

---

[0]App. at 3-4, 76-77, 238-39; appellant's br. at 5.

accepting loans from a subordinate employee.  See 29 C.F.R. §1600.735-203.

The crux of Spain's sexual discrimination and harassment claims is that over the years rumors developed in the Pittsburgh office that Spain and Nelson were having an affair, because his frequent demands for loans led other employees often to see them together privately in his office, the cafeteria, or leaving the office.[0]  Spain charges that because it was improper for Nelson to solicit the loans, he needed to meet her privately to ask for loans, to receive the funds, and to pay them back. Id. at 77.  Spain claims that she learned of the rumors during casual conversations in the office.  She alleges that she complained about the rumors to Nelson approximately four times per year between 1986 and 1988 and once in 1989 and requested him to put them to an end.  Id. at 230.  However, she alleges that the private meetings and loan requests continued, thereby perpetuating the rumors.  According to Spain, the rumors and Nelson's continuation of his conduct in the face of the rumors embarrassed Spain, app. at 231, and caused her co-workers to ostracize her, thereby straining her relationship with them and with her supervisors and making her feel miserable and unable to "deal with the situation."  Id. at 77.  Spain claims that in late

---

[0]App. at 228-31.  Spain's co-worker, Ronald Dean, testified in his deposition that he had heard rumors for some time that Spain and Nelson had a relationship, and he stated that when people would see them together the rumors would escalate.  Id. at 167-70.  He also stated that he was told by a co-worker, "Be careful, you don't want to rub Ellen Spain the wrong way, because if you do, then you're going to have problems with the Director" because there was a relationship between the two of them.  Id. at 168.

7

1989 or early 1990 she told Nelson that she would no longer lend him any money.  Id. at 78.  Spain alleges that this refusal led Nelson to escalate his harassment, ultimately resulting in her being denied a promotion as a result of the rumors.

In 1990, Spain unsuccessfully sought a promotion to GM-13 Supervisory Investigator.  Spain contends that in part Nelson based his decision not to promote her on evaluations by her supervisors in the office.  Appellant's br. at 7.  As evidence of the impact of the false rumors upon her work environment, Spain points to an affidavit of one of these evaluating supervisors, Bruce Bagin, stating that he graded Spain low on the "integrity" category of the evaluation due to his perception of her conduct with Nelson based on the rumors and his observations.  Bagin also stated that Spain had complained to him about the false rumors but that he refused to discuss them because his perception of her conduct seriously had affected his view of her.  App. at 80.  The EEOC contests Spain's assertion regarding the basis for its decision not to promote her and responds that Nelson considered much evidence assessing her qualifications, including the negative opinion of her supervisor in the Dayton Area Office.  Appellee's br. at 4-5.

However, Spain offers as evidence a memorandum from Nelson to his superior, Butler, which discusses the qualifications of the candidate selected for the promotion, as well as the reasons why other candidates were not selected.  App. at 374-76.  In the memorandum, Nelson states that although Spain had "outstanding skills in administrative matters" and was

8

"proficient in the technical aspects" of the position, she ranked dead last among the candidates due to her consistent "inability to relate effectively with the supervisor, co-workers and others." App. at 376. The memorandum further explains that while all of the candidates had "sufficient technical skills to perform the supervisory job only Ms. Spain is rated so low in interpersonal relations to cause her to be ranked so low." Id. (emphasis added). In contrast to Spain's evidence, the EEOC does not precisely indicate what role the written evaluations of Spain's Pittsburgh supervisors played in Nelson's decision not to promote her.

In June 1990, Spain filed a second complaint with the EEOC, and it is this complaint which directly led to this action and thus to this appeal. Spain asserts that the retaliatory conduct began in earnest after she filed this complaint. App. at 253. Moreover, she alleges that Nelson began coming to her house when she was working at home, and he continued to pressure her to make loans to him and to drop the new complaint. Id. at 274-80. On May 6, 1992, the EEOC issued a proposed disposition finding that there had not been discrimination against Spain. Id. at 12-14.

On June 8, 1992, Spain filed her complaint in the district court against the EEOC, Nelson, and Butler. Count I of the complaint alleges sexual and racial discrimination, sexual harassment and unlawful retaliation, all in violation of Title VII of the Civil Rights Act of 1964, and Counts II and III allege the state law claim of intentional infliction of emotional

9

distress by Nelson and Butler. Id. at 1-10. In her complaint, Spain claims that she has been subject to retaliation for having filed prior grievances and that Nelson had stopped speaking to her and removed certain supervisory functions from her. Id. at 3. Moreover, Spain charges that she has been subject to sexual discrimination and harassment stemming from "false rumors being circulated that she was involved in an intimate relationship with defendant Nelson." Id. Spain also alleges that even though Nelson knew the rumors were false, he perpetuated them by continuing his improper loan solicitation and by not taking steps to prevent the rumors. Instead, according to Spain, he and Butler, who also knew about the false rumors, used them to deny her advancement. Id. at 3-4.

In essence, Spain's claims of sexual discrimination and harassment are traceable to Nelson's alleged conduct, which both caused and perpetuated the rumors that, in turn, resulted in the treatment she received from both her co-workers and supervisors. Spain also claims that there was retaliation against her for refusing to continue to lend Nelson money, a practice which she asserts had been instituted because of her sex and race. Id. at 4. In addition to alleging that she was bypassed improperly for a promotion, Spain claims that Nelson had begun downgrading her evaluations, and that Butler had rescinded an award due her. Id.

After depositions were taken, Spain's complaint against Butler was dismissed on November 10, 1992, with her consent. The United States then filed a Certificate of Substitution of itself for Nelson as a defendant under 28 U.S.C. § 2679, and the

10

district court permitted the substitution on March 3, 1993. Thereafter, on April 6, 1993, Spain filed a motion in limine seeking to exclude evidence that her supervisors in the Dayton office evaluated her negatively and evidence that she had not been forthcoming about her education on her employment application. On April 9, 1993, the EEOC filed a motion in limine pursuant to Fed. R. Evid. 401-03 to prevent Spain and her attorney from referring to or offering as evidence any testimony regarding the alleged loans by Spain to Nelson. On April 12, 1993, Spain agreed to dismiss the United States as a defendant. Thus, as Nelson and Butler were no longer parties, the case went forward solely against the EEOC.

On Thursday, July 15, 1993, the day set for jury selection, the district court ruled sua sponte that it would not permit Spain to proceed with her claims of discrimination based on a sexually hostile working environment. In reaching this conclusion the court held that Spain could not base her claims on Nelson's failure to stop the false rumors in the workplace that he and Spain were having an affair. The court reached this decision despite Spain's allegations that the rumors caused her to be shunned by her co-workers and to be evaluated poorly for promotion purposes by her supervisors with respect to her integrity and ability to work with others. App. at 29-40. When the court asked Spain's attorney what type of evidence she intended to present to establish the sexual harassment claim, he replied that he would point to "the failure of the superior[s] to

11

put an end [to] the rumors when they knew about them."  Id. at 30.  The district court then responded:

> I don't think that's recognizable under Title
> VII.  I don't know that an individual who has
> had no relationship with someone has to
> embarrass himself by going forward and
> denying such a relationship just because some
> other person wants him to do that . . . .  And
> I am not going to let you proceed on that, if
> that is the basis of that claim.

Id. at 31.  Spain's attorney then remarked that "[i]t is clearly the basis of the claim" and that he could not "present the case without the testimony of the rumors."  Id.

Spain then attempted to argue orally that the case should be viewed as similar to Jew v. University of Iowa, 749 F. Supp. 946 (S.D. Iowa 1990).  App. at 34–39.  The court in Jew found that there was a sexually hostile work environment where there were rumors that a female professor and her male superior were having an affair, and other faculty members in the position of evaluating her for promotion purposes spread the rumors and conducted a campaign of open slander and innuendo of a sexual nature against her.

However, the district court, agreeing with the EEOC's attorney, distinguished Jew on several grounds.  The court first stated that in Jew, unlike in this case, the supervisor was spreading the rumors.[0]  The court then asked Spain's attorney how

---

[0]Actually nothing in Jew indicates that the supervisor was spreading the rumors.  On the other hand, Spain argues that Nelson created the conditions in which the rumors developed and then did nothing to stop them after being informed of them, and even continued the conduct which resulted in the rumors being perpetuated.

12

the rumors could have been corrected without Nelson telling people that he was not having an affair with Spain.  Id. at 34–35.  The attorney responded that Title VII requires a supervisor on notice of sexual harassment to take corrective action promptly and that Nelson or Butler could have told the concerned employees that the rumors were false.  Id.  In response, the EEOC's attorney argued that the obligation to correct a hostile work environment presupposes that the employer has notice of the environment, and that there was no evidence that Spain complained to Butler about the rumors or evidence that Butler was otherwise on notice of the situation.[0]

The court then asked Spain what evidence she had that the comments made to her created a hostile environment.  Id. at 36.  Spain responded that she was treated as an outcast by other employees, and she proffered testimony that a co-worker had warned another employee to stay away from Spain because she was the "boss' lover."  Id.; see note 4, supra.  The attorney for the EEOC responded that the testimony was that Spain had "got the boss' ear and [would] get you into trouble, which is not the same thing."  Id.  However, Spain disputed the EEOC's recollection of the co-worker's testimony.

The district court then distinguished Jew on the ground that the rumors in that case were that the professor was having an affair with her supervisor and was using the sexual relationship to gain favor, influence and power with her

---

[0]App. at 35–36.  Butler has admitted being asked about the rumors by the employees.  App. at 340.

13

superior.  The court asked Spain whether she had similar evidence.  Id. at 36-37.  Spain's attorney replied that the EEOC also denied Spain the promotion because she had poor interpersonal relationships with her co-employees.  Id. at 37. The EEOC then argued, and the court agreed, that in Jew there was additional evidence of open harassment on the basis of sex in the form of cartoons and in other ways.  Spain responded that her supervisors evaluated her negatively with respect to integrity because of the rumors about the affair.  Id. at 38.

At first, the district court stated that it would allow evidence supporting these allegations inasmuch as a failure to promote due to the rumors had "a sexual connection."  Id. at 39. However, on reconsideration, the court concluded that the poor ratings related to sexual activity and not gender.  Consequently, the court ruled that the evidence could not be admitted unless there was evidence that males who did the same thing were treated differently.  Id. at 44.

The court thus held that Title VII does not require that a supervisor deny rumors that he is having an affair with a subordinate.  Therefore, the district court barred Spain from proceeding on her sexual discrimination and harassment claims based on the evidence she intended to offer.  This ruling effectively granted summary judgment to the EEOC on these claims, and accordingly we review the case as if the court formally granted summary judgment.[0]

---

[0]See note 1, supra.

The district court also ruled on the motions in limine. It denied Spain's motion but granted the EEOC's motion to exclude any evidence regarding whether Nelson solicited and accepted loans from Spain. Id. at 40-43. In opposition to the motion, Spain argued that the private meetings at which Nelson obtained the loans were the source of the false rumors that they were having a relationship and that Nelson could have stopped the rumors by ceasing to meet with Spain to borrow money. Id. at 42-43. However, the court found no evidentiary value in the fact that "other people interpreted meetings . . . in the wrong way." Id.

As the district court prepared to adjourn, Spain's attorney asked whether taking a voluntary non-suit based on the court's ruling would eliminate her appeals. The court responded in the affirmative with respect to the issues on which Spain still was able to proceed. Id. at 45. The court stated that reversal of its ruling regarding the rumor-based sexual discrimination and harassment claims would permit Spain to try those claims, but reversal would not revive her remaining claims. Id. at 45-46. Moreover, the court and Spain's attorney discussed the fact that the evidentiary rulings regarding the sexual discrimination and harassment claims had no bearing on the remaining claims of racial discrimination and retaliation.[0]

Four days later, on Monday, July 19, 1993, as the

---

[0]Id. at 46-47. While district courts are entitled to their opinions as to what is and is not appealable, and what are the likely consequences of an appellate decision, these views do not bind a court of appeals.

15

parties were about to start the trial on the remaining claims, Spain's attorney again suggested that Spain might not continue with the litigation. The court then warned him that if Spain did not proceed on her remaining claims, it would dismiss her case with prejudice for failure to prosecute. App. at 51. Noting the court's intentions, Spain then declared her decision not to proceed with the remaining allegations regarding failure to promote on the basis of race, failure to promote in retaliation for filing prior EEOC charges, and retaliation for filing this suit. App. at 52. The district court then followed through with its warnings and dismissed Spain's case. Furthermore, the court found that Spain could have advised the court of her decision not to proceed during the previous three days. Accordingly, it taxed the $375 costs of the jury against Spain. App. at 52-54.

Spain then appealed. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and we have jurisdiction under 28 U.S.C. § 1291.[0]

---

[0]In our review of the record, we noted that there is some question as to whether we have jurisdiction. The problem derives from the fact that the district court's orders in effect granting summary judgment to the EEOC on Spain's sexual harassment and discrimination claims, excluding evidence from her case, dismissing her case for failure to prosecute, and assessing the jury costs against her were issued orally from the bench and not reduced to writing. This omission raises the question whether the district court has entered a final order for the purposes of 28 U.S.C. § 1291, inasmuch as it did not enter an order in a separate document pursuant to Fed. R. Civ. P. 58. See Bankers Trust Co. v. Mallis, 435 U.S. 381, 387-88, 98 S.Ct. 1117, 1121 (1978); Temple Univ. v. White, 941 F.2d 201, 216 (3d Cir. 1991), cert. denied, 112 S.Ct. 873 (1992).

Yet, as in Bankers Trust, the district court clearly intended that its dismissal of the case would be its final decision, as the court designated the transcript as the order of

16

## II.  DISCUSSION

### A.  Sex-Based Title VII Claims

We first address the district court's grant of summary judgment against Spain on her Title VII claims, including the rejection of her promotion application, arising from a sexually hostile working environment.  Inasmuch as the court in effect granted summary judgment against her, our standard of review is plenary.  Thus,

> [we] review the district court's summary judgment determination de novo, applying the same standard as the district court . . . . [I]n all cases summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law.  Where the movant has produced evidence in support of its motion for summary judgment, the nonmovant cannot rest on the allegations of pleadings and must do more than create some metaphysical doubt.

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 114 S.Ct. 554 (1993).

---

the court, and the judgment of dismissal was recorded on the clerk's docket. App. at XII, 55.  The transcript of the proceeding in which the court entered summary judgment on Spain's claim also was entered on the docket, although we believe that a typographical error was made regarding the date of the proceeding, as it records that the session took place on Sunday rather than on Thursday.  App. at XI.  In light of Bankers Trust, we thus conclude that we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, as no objection was made to the taking of the appeal, and the parties, therefore, are deemed to have waived the separate-judgment requirement of Rule 58.  435 U.S. at 387-88, 98 S.Ct. at 1121.

Spain argues that the district court erred in preventing her from proceeding with her claims because she proffered evidence to support a case of sexual discrimination and harassment under Title VII. Comparing her situation to that of the plaintiff in Jew, and arguing that the district court erred in distinguishing that case, Spain argues that she belongs to a protected group, she was harassed and discriminated against because of her sex, the harassment affected a term or condition of employment, and the EEOC knew about the harassment but failed to take appropriate corrective action. Appellant's br. at 18-19.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Recently, the Supreme Court in Harris v. Forklift Sys., Inc., 114 S.Ct. 367 (1993), discussed the foundation of a sexually hostile work environment claim:

> As we made clear in Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), this language 'is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment. Id., at 64, 106 S.Ct., at 2404, quoting Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 707, n. 13, 98

18

S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978) (some internal quotation marks omitted). When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' 477 U.S., at 65, 106 S.Ct., at 2405, that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' id., at 67, 106 S.Ct., at 2405 (internal brackets and quotation marks omitted), Title VII is violated.

Harris, 114 S.Ct. at 370. Furthermore, the Court stated that to determine whether an environment is "hostile" or "abusive" a court must look at "all the circumstances." Id. at 371.

In Andrews v. Philadelphia, 895 F.2d 1469 (3d Cir. 1990), we discussed the requirements for establishing a claim predicated on a sexually hostile work environment:

[F]ive constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII: (1) the employees suffered intentional discrimination because of their sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

895 F.2d at 1482 (footnote and citations omitted). As we noted, "these factors include both a subjective standard (No. 3) and an objective standard (No. 4)."[0] Since our decision in Andrews, the Supreme Court in Harris has affirmed that a hostile work

---

[0]Id. at 1483. We further explained: "The subjective factor is crucial because it demonstrates that the alleged conduct injured this particular plaintiff giving her a claim for judicial relief. The objective factor, however, is the more critical for it is here that the finder of fact must actually determine whether the work environment is sexually hostile." Id.

environment claim must involve both subjective and objective harm to the employee.[0]

In this case, Spain asserts that the harassment she suffered led to her work environment being sexually hostile and to the denial of a promotion. Quite clearly, she presents an atypical sexually hostile work environment claim in that the alleged wrongful conduct does not include the type of blatantly sexist behavior that is frequently the hallmark of such claims. For example, this case differs from Meritor Sav. Bank v. Vinson, 477 U.S. 57, 60, 106 S.Ct. 2399, 2402 (1986), in which an employee testified that her employer "fondled her in front of other employees, followed her into the women's restroom when she went there alone, exposed himself to her, and even forcibly raped her on several occasions." See also King v. Hillen, No. 92-3601, 1994 U.S. App. LEXIS 7124, at *3 (2d Cir. Apr. 13, 1994). But an employee can demonstrate that there is a sexually hostile work environment without proving blatant sexual misconduct. Indeed, in commenting on the Andrews elements, we noted that the intent

---

[0]In Harris, 114 S.Ct. at 370, the Court explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

20

to discriminate on the basis of sex could be demonstrated through actions which "are not sexual by their very nature," although we stated that a more fact intensive analysis would be necessary in such a case. Andrews, 895 F.2d at 1482 n.3.

Consequently, we recount Spain's allegations and evidence thereof and then consider them in light of the elements of a sexually hostile work environment claim under Andrews.[0] As we discuss above, Spain charges that she was the subject of false rumors that she was having a sexual relationship with Nelson and had gained influence over him as a result of their relationship. These rumors developed among her co-workers because they often saw her and Nelson in private meetings. However, these meetings allegedly resulted from Nelson's improper solicitation of loans, a practice which lasted for several years after Nelson initiated it.

Spain charges that as a result her work environment was affected in essentially five ways. First, she was subjected to the spreading of false rumors about her sexual affairs that impugned the integrity of her job performance. The very existence of the rumors caused Spain embarrassment. Second, due to the rumored sexual relationship, Spain's co-workers allegedly treated her like an outcast, leading to poor interpersonal relationships between herself and them, and causing Spain to feel miserable. Third, the rumors and the resulting poor

---

[0]We note that while we evaluate Spain's allegations under the Andrews standards, the district court seems to have based its ruling primarily on its interpretation of Jew.

21

interpersonal relationships at work led supervisory personnel to evaluate Spain negatively for advancement purposes. Spain proffered testimony from a co-worker and a supervisor regarding the rumors and these effects on her and on her environment. Fourth, Spain alleges that Nelson knowingly exacerbated the situation. After creating the conditions in which the rumors developed, Nelson perpetuated the rumors by continuing to demand loans from Spain and to meet with her privately for this purpose, even after Spain informed him of the rumors and asked him to stop them. Finally, Spain contends that Nelson denied her a promotion in 1990 based on the rumors and the resulting effects they had upon her interpersonal relationships at work and her evaluations by her supervisors. She offered evidence as well to support this contention.

The first element of a hostile work environment claim under Andrews is that the employee have suffered intentional discrimination because of her sex. 895 F.2d at 1482. Spain's charge that she suffered such discrimination can withstand a motion for summary judgment as to this element. We have just recounted Spain's contentions and the evidence she offered to prove them concerning the rumors and their multiple effects upon her environment and advancement. We find that the first Andrews element is satisfied because the crux of the rumors and their impact upon Spain is that Spain, a female, subordinate employee, had a sexual relationship with her male superior. Unfortunately, traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their

22

sexual behavior stubbornly persist in our society. Because we are cognizant that these stereotypes may cause superiors and co-workers to treat women in the workplace differently from men, we find that a reasonable jury could conclude that Spain suffered the effects she alleges because she was a woman. Consequently, Spain has made "out a case under Title VII" by showing "that gender [was] a substantial factor in the discrimination, and that if [Spain] had been a man she would not have been treated in the same manner." Andrews, 895 F.2d at 1485 (internal quotation marks omitted).

We note that there is no suggestion in the record that males who worked with Nelson were harassed similarly. However, the district court erred in requiring Spain to produce evidence that males in a similar position were treated differently. A jury reasonably could conclude that if Spain had been a male, rumors would not have started that she had gained influence with Nelson through physically using her sex, particularly the ability to create problems for a fellow employee who "rubbed her the wrong way."[0] Our discussion above leads us to believe that even if a male had a relationship bringing him into repeated close contact with Nelson, it would have been less likely for co-workers to have believed that the relationship had a sexual basis. Thus, the resulting poor interpersonal relationships, negative evaluations, and denial of advancement might not have occurred for a male as they allegedly did for Spain, inasmuch as

---

[0] Spain's co-worker, Ronald Dean, testified that he had been warned not to rub Spain the wrong way. See app. at 168.

23

the situation which caused them simply would not have been created. Furthermore, while it is true that the rumors also implicated Nelson, the rumors did not suggest that his involvement in the alleged relationship had brought him additional power in the workplace over his fellow employees, and the employees had no reason for resenting him in the way they did Spain. Accordingly, he did not have to endure a hostile working environment brought about due to his sex.

In addition, Spain's allegations that Nelson's improper conduct first created the conditions under which the rumors developed and then perpetuated them distinguishes Spain's claims from claims in other scenarios which might not support a sexually hostile work environment cause of action. See King v. Hillen, 1994 U.S. App. LEXIS 7124 at *35. Thus, this is not a case in which the rumors concerned the behavior of a co-worker outside of the workplace, or in which rumors developed as the result of other employees' misperception of a supervisor's and an employee's frequent but necessary, job-related interaction. Rather, here there are factual questions for trial of whether the rumors developed and persisted as a result of Nelson's improper behavior. As in Jew, the situation here was "not merely one of idle gossip about an alleged office romance." 749 F. Supp. at 959. Consequently, Spain properly has alleged, and supported with materials developed in discovery, that the rumors directed at her and her resulting ostracization and adverse evaluation for advancement purposes were both sex-based and intentional.

24

In reaching our conclusion on this point we have paid particular attention to the distinction we drew in Andrews between sexual misconduct in which the intent to discriminate "is implicit, and thus should be recognized as a matter of course" and "actions [which] are not sexual by their very nature." 895 F.2d at 1482 n.3. Thus, an employer by its conduct might create conditions which all its employees, without regard for sex, reasonably consider as harassing and yet the employer would not discriminate on the basis of sex. Accordingly, where an employee claims sex discrimination predicated on sexually neutral conduct it may be necessary for the employee to establish that the employer's motives for its actions were sexual. If the discrimination of which Spain complained was predicated merely on the demands for loans, her case might be of that nature.

However, Spain's allegations are not predicated on sexually neutral conduct. Rather, she alleges that the harassment resulted from the rumors that she was having an affair with Nelson. Thus, the harassment directed against her as a woman had a sexual orientation by its very nature. Overall, we are satisfied that Spain has offered evidence that she suffered intentional discrimination because of sex.

The second requirement for demonstrating a sexually hostile work environment is that the discrimination must have been pervasive and regular. Andrews, 895 F.2d at 1482. In determining that Spain's claim can withstand a motion for summary judgment as to this Andrews element, we note that she has alleged that the rumors developed over a period of several years between

25

1986 and 1990 and manifested themselves through her continuous interaction with her colleagues and supervisors. Moreover, Nelson's loan solicitations and the private meetings allegedly occurred throughout this time, continuing in particular after Spain had asked him to put an end to the rumors. Therefore, there is a fact question for trial as to the pervasiveness and regularity of Nelson's conduct and the impact of the rumors on Spain.[0]

Third, the discrimination must have affected Spain detrimentally, the subjective requirement of Andrews, as later recognized in Harris. As we discuss above, Spain has contended that she perceived herself to be subject to an abusive environment as manifested through her co-workers' and supervisors' interaction with her. Thus, determination of the particular effect of the rumors on Spain is another question of fact for the jury.

Under Andrews, the fourth requirement to demonstrate a sexually hostile work environment is that the discrimination must be such that it would have detrimentally affected a reasonable person of the same sex in Spain's position. The Supreme Court explained this requirement in Harris: "Conduct that is not severe or pervasive enough to create an objectively hostile or

---

[0] We recognized in Bouton v. BMW of N.Am., Inc., No. 93-5296, slip op. at 5 n.2 (3d Cir. June 10, 1994), that the Andrews requirement that the discrimination be "pervasive and regular" differs slightly in form from the Supreme Court's statement in Meritor Sav. Bank, 477 U.S. at 67, 106 S.Ct. at 2405, that the discrimination be "severe or pervasive." Regardless of whether the two formulations substantively differ, both have been met here for summary judgment purposes.

26

abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview."  114 S.Ct. at 370.  In Harris, the Court held that under Title VII conduct can be actionable as harassment creating a sexually hostile work environment, even though it does not affect seriously an employee's well-being or lead the employee to suffer injury.  Id. at 370-71.  Spain has alleged that she faced an environment in which her co-workers treated her as an outcast and in which her supervisors evaluated her negatively for advancement.  Thus, the alleged workplace hostility manifested itself both in the immediate interaction between Spain and her colleagues and in connection with her consideration for a promotion in 1990.

We recognize, of course, that, as the EEOC points out, Title VII does not require fellow workers to socialize with an employee they dislike.  Appellee's br. at 11 n.6.  However, we must accept Spain's allegations and draw inferences from them in her favor, and Spain has alleged more than that her co-workers disliked her.  She has presented proof of injury directly flowing from the sexually hostile work environment.  Consequently, we find that there is a factual question of whether a reasonable person in Spain's position would have been affected detrimentally by the environment she faced.

In Andrews, the final factor for determining whether there was a sexually hostile work environment is the existence of respondeat superior liability:

27

> '[L]iability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action.' <u>Steele v. Offshore Shipbuilding, Inc.</u>, 867 F.2d 1311, 1316 (11th Cir. 1989); <u>see</u> <u>Hicks v. Gates Rubber [Co.</u>, 833 F.2d 1406, 1418 (10th Cir. 1987)]. Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable. <u>Katz v. Dole</u>, 709 F.2d [251, 255 (4th Cir. 1983)].

895 F.2d at 1486. <u>See</u> <u>also</u> <u>Bouton v. BMW of N. Am.</u>, No. 93-5296, slip. op at 4-13 (3d Cir. June 10, 1994). Spain contends that the EEOC took no action to stop the harassment even though managers at three levels recognized the situation she faced: Butler, app. at 340, Nelson, app. at 120, 125, and Spain's immediate supervisor, Bruce Bagin, app. at 80. In particular, she charges that she informed Nelson of the rumors and asked him to put an end to them, app. at 77, 230, but that he did nothing. App. at 121. Therefore, Spain's allegations and evidence of her superiors' knowledge of the environment and their indifference to it are sufficient to withstand a motion for summary judgment as to this element of her claim.

In its ruling, the district court stated that Title VII does not require a supervisor who is the object of a rumored affair between himself and a subordinate to "embarrass himself" by denying the rumors. App. at 31. Yet, without further qualification or explanation, this statement is too broad. As we already have indicated, if the employer knows of the harassment, it is obligated to take prompt remedial action. We do not

28

suggest that Title VII required that Nelson personally deny the rumors. However, assuming that Spain's allegations regarding the rumors are true, the law did require management personnel to take remedial action. Accordingly, we hold that the district court erred in granting summary judgment to the EEOC predicated on the court's interpretation of the EEOC's obligation under Title VII. Overall, we think that it is clear that Spain has established the requirements for a claim of a sexually hostile work environment under Andrews, and that material issues of fact remain for trial. Thus, the district court erred in barring Spain from going forward based on the evidence she intended to offer to prove these claims.

While we have predicated our result on Andrews and Harris, we nevertheless will discuss Jew, as it seems to be the only reported case dealing with circumstances similar to those here. The district court first distinguished Jew on the grounds that the supervisor in this case, Nelson, was not involved in spreading the rumors and was, in fact, an object of them. App. at 34. However, as Spain points out, Jew does not suggest that the supervisor in that case was involved in spreading the rumors, nor did Jew rely on such a consideration. Furthermore, on the record, it could be concluded that Nelson personally was involved in spreading the rumors due to his alleged involvement in creating the conditions under which they developed and were perpetuated, and due also to his refusal to take steps to end them. Thus, with respect to this aspect of the district court's ruling, it appears that the court seized upon a nonexistent

29

distinction between this case and Jew and then applied it improperly to Spain's allegations.

The district court also pointed out that in Jew the rumors suggested that the plaintiff had used a sexual relationship to gain favor, influence and power with an administrative superior. Accordingly, the court asked Spain what evidence there was of that type of situation here.[0] Yet, in so asking, the court ignored Spain's offer of testimony by a co-worker that another employee warned him to stay away from Spain because she could get him in trouble with Nelson due to her relationship with him. Id. at 35-36 (court proceeding of July 15, 1993); id. at 168 (deposition testimony). Thus, there was evidence that the rumors alleged that Spain had attained influence with Nelson through the use of a sexual relationship.

As we recount above, however, the attorney for the EEOC argued that this testimony regarding Spain's alleged influence was based upon her having the "boss' ears," as opposed to their having a sexual relationship. Id. at 36. Yet, the record indicates that the EEOC's recollection of the co-worker's testimony was incomplete, in that the co-worker testified to the relationship between Spain and Nelson as the reason for Spain's potential influence over other employees before further explaining that Spain had Nelson's "ears." Id. at 168. Therefore, the district court erred to the extent that it may

---

[0]App. at 36-37. It was on this ground that the district court in Jew found that the plaintiff was subject to sex-based harassment even though the male superior was also the object of the rumors.

have accepted the EEOC's account of the co-worker's testimony in determining that Spain did not allege that the rumors involved her use of a sexual relationship to attain influence. Furthermore, Spain offered evidence that a supervisor rated her poorly for advancement purposes on account of the rumors and her resulting poor interpersonal relationships. Thus, there was an additional reason for the court not to have distinguished Jew on the grounds that the plaintiff in that case used a sexual relationship to her advantage.[0]

Finally, while the district court correctly pointed out that this case does not involve allegations of overt sexual harassment, such as the posting of cartoons and the other activities described in Jew, we have noted that "[i]ntimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." Andrews, 895 F.2d at 1485 (quoting Hall v. Gus Constr. Co., 842 F.2d 1010, 1014 (8th Cir. 1988)). It would have been erroneous, therefore, for the district court to have barred Spain from going forward on the grounds that she had not alleged overt instances of harassment equivalent to those in Jew.

---

[0]App. at 37-40. Although the district court initially determined that it would allow such evidence, it later changed its decision on the ground that the poor ratings had to do with sexual activity and not gender. Id. at 39, 44. The EEOC argues that the court's exclusion of this evidence was proper because Spain claims that she was denied the promotion on account of her race but not due to her sex. Appellee's br. at 14 n.8. However, Spain's complaint and her argument before the district court clearly were that she was subject to a sexually hostile work environment and denied a promotion on account of her sex. See id. at 1-6 (complaint), app. at 37-40 (trial transcript).

In sum, our analysis of the requirements of Title VII leads us to hold that the district court erred in barring Spain from proceeding with her sexual discrimination and harassment claims. Spain has presented evidence that she was subjected to a sexually hostile work environment in the form of rumors among her colleagues that she was involved in a sexual relationship with her superior. These rumors allegedly developed and continued due to the superior's conduct. Moreover, they allegedly led her fellow employees to shun her and her supervisors to evaluate her poorly for advancement purposes. Furthermore, the management personnel did not take remedial action to eliminate the rumors. We are satisfied that considering all the circumstances, and given Spain's unique allegations, she should be allowed the opportunity to prove her claims regarding the sexually hostile work environment she allegedly faced.

## B. Evidentiary Rulings

We now turn to the district court's exclusion of Spain's evidence in support of her sexual discrimination and harassment claims, a ruling made in conjunction with the court's decision to prohibit Spain from proceeding with her claims. While we ordinarily would review an evidentiary ruling before making a substantive decision depending on whether evidence was admitted, we have reversed that order because our discussion of the substance of the sexual discrimination and harassment claims has cast light on the evidentiary question. We review the district court's admissibility ruling under an abuse of discretion

32

standard, as we are concerned with an issue of the application of rather than the interpretation of the Federal Rules of Evidence. United States v. Console, 13 F.3d 641, 656 (3d Cir. 1993), cert. denied, 128 L.Ed.2d 377, 62 U.S.L.W. 3722 (1994); Petruzzi's IGA Supermarkets, 998 F.2d at 1237.

The EEOC's motion in limine sought to exclude evidence concerning Nelson's alleged solicitation and acceptance of loans from Spain on the grounds:  (1) that such evidence was not relevant to Spain's Title VII action under Rule 401, and therefore was inadmissible under Rule 402; and (2) that under Rule 403 the probative value of the evidence was outweighed substantially by the danger it might lead to unfair prejudice, confusion of the issues, and delay.  App. at 56-62.  The district court granted the EEOC's motion, stating simply:  "So what?  If other people interpreted meetings that he had for some other reason in the wrong way, so what?"  Id. at 42-43.  Although it would thus appear that the district court excluded the evidence on relevancy grounds pursuant to Rule 402, the district court's ruling is ambiguous, and the parties base their arguments on both Rule 402 and Rule 403.  Consequently, we will consider the admissibility standards of Rules 401 and 402, as well as the prejudice standards of Rule 403, as we believe that under either of these standards, the district court abused its discretion in excluding the evidence in question.

1. Relevance

We recently discussed Rule 401 and the standards for excluding evidence on relevancy grounds:

> Under Fed. R. Evid. 401, evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' As noted in the Advisory Committee's Note to Rule 401, '[r]elevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case.' Because the rule makes evidence relevant 'if it has any tendency to prove a consequential fact, it follows that evidence is irrelevant only when it has no tendency to prove the fact.' 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5166, at 74 n. 47 (1978) (emphasis added). Thus the rule, while giving judges great freedom to admit evidence, diminishes substantially their authority to exclude evidence as irrelevant. Id. § 5166, at 74.

Blancha v. Raymark Indus., 972 F.2d 507, 514 (3d Cir. 1992).

The EEOC argues that the district court correctly excluded the evidence as irrelevant, inasmuch as evidence concerning the reason for the meetings between Spain and Nelson and the resulting rumors does not tend to prove or disprove Spain's allegations regarding the rumors and that she was subjected to sexual harassment as a result. Appellee's br. at 15-16. The EEOC contends that even under Spain's view of the case, the occurrence of the meetings with Nelson, but not the reasons for the meetings, is significant. Id. at 16.

Yet, it is clear that evidence concerning the reasons for the private meetings between Nelson and Spain had a tendency

34

to prove certain elements of Spain's claims, for the evidence demonstrated why Nelson would have wanted private meetings, as the EEOC regulations prohibited him from borrowing money from subordinates. Furthermore, the reasons for the meetings tend to demonstrate why they were so frequent. More importantly, if a jury knew the reason for the meetings, it would gain insight into the credibility of Spain's contention that Nelson did not take any steps to stop the rumors or initiate any other remedial actions after learning about the rumors, for remedial action might have required him to explain his conduct. Consequently, the evidence is relevant to prove that Nelson was at least partially responsible for the development and perpetuation of the false rumors. Inasmuch as under Harris all the germane circumstances should be considered in an evaluation of Spain's sexually hostile work environment claim, we believe that the district court abused its discretion in ruling that the evidence was inadmissible under Rules 401 and 402.

### 2. Unfair Prejudice

In Blancha, we also discussed Rule 403 and the standards for excluding evidence that substantially is more prejudicial than probative:

> Fed. R. Evid. 403 states that evidence, even if relevant, may be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' Thus evidence may be excluded when its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issues.

35

> United States v. Dennis, 625 F.2d 782, 797
> (8th Cir. 1980). . . . Evidence should be
> excluded under Rule 403 only sparingly since
> the evidence excluded is concededly
> probative.  United States v. Terzado-Madruga,
> 897 F.2d 1099, 1117 (11th Cir. 1990).  The
> balance under the rule should be struck in
> favor of admissibility.  Id.; Dennis, 625
> F.2d at 797 (8th Cir. 1980).  Finally, we
> note that in determining the probative value
> of evidence under Rule 403, 'we must consider
> not only the extent to which it tends to
> demonstrate the proposition which it has been
> admitted to prove, but also the extent to
> which that proposition was directly at issue
> in the case.'  United States v. Herman, 589
> F.2d 1191, 1198 (3d Cir. 1978), cert. denied,
> 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386
> (1979).

Blancha, 972 F.2d at 516.  The EEOC argues that the district court properly excluded evidence of the loans under Rule 403 because evidence of Nelson's questionable conduct would be highly likely to distract the jury from focusing on the claim of sexual harassment and would cause the factfinder to be inclined to find a Title VII violation out of a desire to punish the supervisor for his unethical conduct.  Appellee's br. at 16-17.

We conclude, however, that the probative value of this evidence is not "substantially outweighed by the danger of unfair prejudice."  We already have discussed the relevance of the evidence to an understanding of why Spain's co-workers continued to see her privately with Nelson even after she and Nelson knew of the rumors and to an understanding of why Nelson did not take steps to stop the rumors.  Indeed, Nelson admits that loans were made on the dates for which Spain has canceled checks, although he denies that he solicited them and offers an alternative

36

explanation. Appellee's app. at 4-7. Thus, the dispute concerns not whether they were loans, but rather the motivation for them and their frequency.

The EEOC contends, in essence, that the evidence would make the jury more likely to turn a breach of ethics into a finding of sexual harassment. "Yet, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Petruzzi's IGA Supermarkets, 998 F.2d at 1241 (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786, 2798 (1993)). Given our cautious approach to Rule 403 exclusions at the pretrial stage, see Petruzzi's IGA Supermarkets, 998 F.2d at 1240; In Re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 859-60 (3d Cir. 1990), cert. denied, 499 U.S. 961, 111 S.Ct. 1584 (1991), we hold that the district court abused its discretion in excluding the evidence under Rule 403.

### C.  Dismissal For Failure to Prosecute

Spain argues that the district court improperly dismissed the balance of her case for failure to prosecute after she determined not to go forward with her racial discrimination and retaliation claims following the dismissal of the sexual

discrimination and harassment claims.  We hold that the district court did not abuse its discretion in this order.[0]

As we have noted already, after the district court issued its ruling with respect to the sexual discrimination and harassment claims and excluded the evidence of the loans, Spain asked the court whether taking a voluntary non-suit on the remaining claims would eliminate her right to appeal on them. The court quite clearly explained that this would be the result with respect to the issues on which the court determined that Spain could proceed.  App. at 45-46.  Moreover, the court and Spain discussed the fact that the evidence with respect to the sexual discrimination claim had no bearing on the remaining claims of racial discrimination and retaliation, and Spain agreed that it did not.  Id. at 46-47.  When the case resumed after the weekend, Spain again raised the possibility of not going forward and the court again warned her of the consequences if she did not.  Id. at 51.  As a result, when Spain decided not to proceed, the district court dismissed the remaining claims for failure to prosecute.  Id. at 52.

Spain argues that "because of the court's clear error in denying the evidence as to the sexual harassment, justice requires reinstatement of the entire Complaint."  Appellant's br. at 25.  She contends that her remaining claims of failure to promote based on race and retaliation are connected closely to

---

[0]We review a dismissal of an action for failure to prosecute under an abuse of discretion standard.  Dunbar v. Triangle Lumber and Supply Co., 816 F.2d 126, 128 (3d Cir. 1987).

38

the evidence she was not permitted to introduce. Id. Yet as the EEOC points out, and as we have reviewed above, Spain agreed before the district court that the evidence concerning the loans and the failure to correct the rumors was irrelevant to whether she was not promoted on account of her race or whether there was retaliation against her for filing the previous or present complaint. App. at 46-47.

While Spain now takes a position contrary to that which she took before the district court, she provides no detailed argument for why the excluded evidence relates to the racial discrimination and retaliation claims. Rather, Spain simply states that proof of her other claims depends upon the jury having knowledge of all of the events. Appellant's br. at 25. However, the excluded evidence regarding the loans would not tend to prove the remaining claims. Furthermore, even if the EEOC had intended to introduce Spain's poor relationship with her colleagues allegedly resulting from the loans and rumors as part of its defense to her claims, the EEOC correctly notes that such alleged sex-based evidence would be irrelevant to her racial discrimination and retaliation claims. In any event, even if the excluded evidence was important to the racial discrimination and retaliation claims, Spain was obliged to proceed with the trial notwithstanding the exclusion of the evidence. A party disappointed with a court's ruling may not refuse to proceed and then expect to obtain relief on appeal from an order of dismissal or default. See Marshall v. Sielaff, 492 F.2d 917 (3d Cir. 1974).

We recognize that dismissal is a harsh remedy to which a court should resort only in extreme cases, as "the policy of the law is to favor the hearing of a litigant's claim on the merits." Id. at 918 (citation omitted). Nevertheless the courts may dismiss cases with prejudice for want of prosecution under Fed. R. Civ. P. 41(b) or under their inherent power so that they can "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Id. (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1389 (1962)); see also Eash v. Riggins Trucking Inc., 757 F.2d 557, 561, 564 (3d Cir. 1985) (in banc). Ordinarily, when a court is determining sua sponte or upon motion of a defendant whether to dismiss because of a plaintiff's failure to prosecute, and the plaintiff is opposing the motion, the court must consider several factors in reaching its decision: (1) the extent of the party's personal responsibility; (2) the prejudice to the opponent; (3) any history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) whether effective alternative sanctions are available; and (6) the meritoriousness of the claim or the defense. See Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863, 868 (3d Cir. 1984).

However, in contrast to situations in which a court must balance factors because the plaintiff does not desire to abandon her case but has encountered problems in going forward, Spain willfully refused to prosecute her remaining claims after receiving an adverse ruling by the district court on the sexual discrimination and harassment claims. In these circumstances, we

40

cannot fault the district court for dismissing the suit.  See
Zagano v. Fordham Univ., 900 F.2d 12, 14 (2d Cir. 1990).  Indeed,
it is difficult to conceive of what other course the court could
have followed.  Continuing the matter would not have helped
Spain, as she was not confronted with a situation in which she
faced an obstacle to prosecution of her case that could have been
overcome at a later date.  Furthermore, the court's sua sponte
action was appropriate; no motion from the EEOC was required.[0]
Accordingly, we will affirm the order of the court dismissing
Spain's racial discrimination and retaliation claims.


### D.   The Jury Costs

Finally, Spain appeals from the district court's
assessment of jury costs of $375 against her following the
court's dismissal of her case.  We apply an abuse of discretion
standard of review to a court's imposition of sanctions under its

---

[0]Link, 370 U.S. at 630-31; 82 S.Ct. at 1388-89.  Spain's reliance
on Coursen v. A.H. Robbins Co., 764 F.2d 1329 (9th Cir.), as
amended, 773 F.2d 1049 (9th Cir. 1985), is misplaced. In Coursen,
which involved a claim of injury from a birth control device, the
district court denied the plaintiffs' motion to preclude the
defendant from introducing evidence regarding their sexual
history.  764 F.2d at 1341.  Plaintiffs' actions were dismissed
with prejudice when they then refused to proceed to trial.  Id.
at 1342.  The Court of Appeals for the Ninth Circuit vacated the
dismissal and remanded the case to the district court "with
instructions that plaintiffs be directed to proceed to trial or
have their cases dismissed."  Id. at 1343.  Coursen is quite
unlike the present case, however, in that the court of appeals
remanded the case to the district court to give the plaintiffs
the option to continue with the litigation due to the confusion
surrounding the entry of the dismissal order and the resulting
availability of appellate review.  Here, there is no doubt that
Spain had a complete understanding of the implications of
deciding not to proceed prior to making that decision.

41

inherent power.  <u>Chambers v. Nasco, Inc.</u>, 501 U.S. 32, __, 111 S.Ct. 2123, 2138 (1991) (citing <u>Link</u>, 370 U.S. at 633, 82 S.Ct. at 1390).

While federal courts possess the inherent power to punish conduct which abuses the judicial process, they must exercise the power "with restraint and discretion." <u>Chambers</u>, 501 U.S. at ___, 111 S.Ct. at 2132 (citing <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463 (1980)).  "A primary aspect of that discretion is the ability to fashion an appropriate sanction" for abusive conduct.  <u>Chambers</u>, 501 U.S. at , 111 S.Ct. at 2132-33.  Because we believe that there are no grounds for finding that Spain abused the judicial process with respect to when she notified the court she would not proceed with the trial, we hold that the district court abused its discretion in assessing the jury costs against her.

As we describe above, the district court precluded Spain from proceeding with her sexual discrimination and harassment and discrimination claims and issued its evidentiary exclusion decision on Thursday, July 15, 1993, the day that the jury was picked.  The testimonial portion of the trial was to begin on Monday, July 19, 1993.  However, on that morning, Spain informed the court she would not proceed with her remaining claims.  The district court then dismissed her case with prejudice and assessed the jury costs against her.

Perhaps Spain could have reached her decision not to prosecute her remaining claims and informed the court of her decision on the day that the court issued its first rulings and

42

the jury was picked, or even on the next day, Friday, July 16, 1993.  Yet, even though the trial was set to begin only the following Monday, and the court was aware that Spain was contemplating abandoning her remaining claims, it set no time limit for her decision.  See Boettcher v. Hartford Ins. Group, 927 F.2d 23 (1st Cir. 1991) (assessment of jury costs by district court reversed when case settled on day of trial).  Thus, we find no basis in the record to support a conclusion that Spain and her attorney acted in bad faith or otherwise abused the judicial process in taking the weekend before reaching a final decision not to proceed.[0]  Moreover, as the district court imposed the sanction without affording Spain prior notice and an opportunity to be heard, its action raises due process concerns.  See Eash, 757 F.2d at 570-71.  While we could, of course, cure the due process problem by remanding the matter for reconsideration of the imposition of the sanction, we think that in view of the modest $375 assessment, it would be prudent to consider the matter on the record as it exists.  Overall, we are convinced that the district court abused its discretion in assessing the costs of the jury against Spain.

III.

CONCLUSION

---

[0]There is no support in the record to conclude that Spain reached her decision before the weekend or even before Monday. In fact, Spain's attorney told the court that he and Spain spent the weekend talking about what to do.

43

Based on the aforesaid analysis, we will reverse the orders of the district court entering summary judgment against Spain on the portions of count I of her complaint alleging the sexual discrimination and harassment claims, excluding the evidence she offered to prove those claims, and assessing the costs of the jury against her. We will affirm the court's dismissal of the remainder of Spain's case for failure to prosecute. We will remand the case to the district court for further proceedings on the reinstated claims. The parties will bear their own costs on this appeal.