Velma **CLARK**

v.

**COMMONWEALTH OF PENNSYLVANIA, et al.**

No. CA 93–1365.

United States District Court, E.D. Pennsylvania.

May 4, 1995.

Mignon D. Klein, Robert Ross, Alise R. Panitch, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, PA, for plaintiff.

Claudia M. Tesoro, Beth Anne Smith, Office of Atty. Gen., Philadelphia, PA, for defendants.

## OPINION AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Velma Clark ("Clark"), a black woman, brings this action under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 1983, and the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat.Ann. § 951, *et seq.* ("PHRA") against defendants Commonwealth of Pennsylvania Department of Welfare ("DPW"), Delaware County Board of Assistance ("DCBA"), and defendants Harold Sherman, Patricia Jacobs, Patricia Graves and Judith Montgomery in their official and individual capacities. Defendants have filed a motion for summary judgment, and plaintiff has filed motions for partial summary judgment and for leave to amend the complaint.

Although a number of legal issues are raised the following are the most significant: 1) whether the use of a civil service exam to determine promotions on two separate occasions within two years constitutes a continuing violation under Title VII of the Civil Rights Act of 1964; I find that it does not; 2) whether individual defendants may be liable in their individual capacity under Title VII and the PHRA; I find that they may not; 3) whether a state agency charged with ensuring that promotions within its county are lawful, but which allegedly was not involved in the promotions at hand, is a proper defendant in an employment discrimination case; I find that it is; and 4) whether a plaintiff can file claims in federal court based on EEOC complaints for which she had received right to sue letters more than ninety days prior, but which were reasonably related to the original EEOC complaint which was timely filed in federal court; I find that she can.

Before me now are 1) motion of plaintiff to amend her complaint; I will deny this motion; 2) motion of plaintiff for partial summary judgment; I will deny this motion; 3) motion of defendants for summary judgment on plaintiff's Title VII claims; I will deny motion of defendants for summary judgment on plaintiff's disparate impact, disparate treatment, hostile environment, and retaliation claims, except I will grant motion of defendants for summary judgment on plaintiff's disparate treatment claim based on the failure to promote in the autumn of 1987; 4) motion of individual defendants for summary judgment on individual liability under Title VII; I will grant this motion; 5) motion of defendants for summary judgment on plaintiff's PHRA claims; I will grant this motion; 6) motion of defendants for summary judgment on plaintiff's 42 U.S.C. § 1983 claim; I will defer ruling on this motion; and 7) motion of defendants for summary judgment as to plaintiff's request for compensatory and punitive damages under Title VII; I will limit plaintiff to compensatory and punitive damages for post November 21, 1991 acts of intentional discrimination.

## I. Factual Background

The material facts relevant to the motion for leave to amend the complaint and to the motions for summary judgment are either undisputed or stated in a light most favorable to the non moving party [1].

1. Glossary

I offer the following glossary for ease of reference:

CSC Civil Service Commission
DCAO Delaware County Assistance Office
DCBA Delaware County Board of Assistance
DPW Department of Welfare for the Commonwealth of Pennsylvania
OIG Office of the Inspector General
PCBA Philadelphia County Board of Assistance
PHRC Pennsylvania Human Rights Commission

Bragg Clark's immediate supervisor at the DCAO from 1983 to 1990
Emmi A Supervisor in the DCAO
Graves The Area Manager for the DPW for counties including Delaware County from November 1985 until September of 1988
Jacobs Area Manager for the DPW for areas including Delaware County after Graves left in 1988.
Laume Clark's immediate supervisor after Bragg left in 1990

In 1971, plaintiff, Velma Clark, a black woman, went to work for the Philadelphia County Board of Assistance ("PCBA") as an Income Maintenance Caseworker ("Caseworker"). In October of 1982 she transferred as a caseworker to the Delaware County Assistance office ("DCAO"), an office under the supervision of the Delaware County Board of Assistance ("DCBA"). (Pl.'s Complaint, ¶ 12). At the time defendant Harold Sherman, a white man, was the Executive Director of the DCAO. In 1985 defendant Patricia Graves, a black woman, became Sherman's superior when she took the position of Area Manager in the Department of Welfare ("DPW") responsible for Delaware County. She remained in that position until September of 1988 (Graves depo. p. 216).

In November of 1985 defendant Sherman authorized the posting of three vacancies for Income Maintenance Supervisor ("Supervisor") positions within the DCAO. The DPW authorized specific methods that were permissible for directors to use in filling these positions. Included among these were those designated "promotion without exam method" and a civil service exam method used in conjunction with the rule of three ("civil service exam method").

Under the civil service exam method to be eligible for promotion an applicant must take, and pass, the civil service exam for the position. Possible passing exam scores include 108, 96, 84, 72, and 60; below this is failure. If an applicant passes the exam he or she is placed on the list of eligibles. Under the rule of three, which is a mandatory component of the civil service exam method (Def.'s answer to Pl.'s first set of interrogatories ¶ 6; Civil Service Commission Management Directive M580.1, Part A), the people with the top three scores on the list of eligibles, and anyone who ties them, is interviewed for the promotions. Once the list of interviewees is determined the decision of whom to promote is based solely on the interview, and the exam scores are no longer relevant.

Under the promotion without exam method a vacancy is announced and a deadline is set for applications. After the deadline has passed the candidates meeting minimum criteria are scored according to meritorious service and seniority. The meritorious service score is determined by assigning a point total for the candidate's rating on his or her last annual performance evaluation. The seniority score is determined by dividing the number of months that the candidate worked in the next lower classification by six. These two scores are then added together to attain the final promotional point total. All candidates who score within fifteen points of the highest scoring candidates are considered "relatively equal" and can be interviewed for the promotion. Again, once the list of interviewees is determined the scores are no longer relevant. (Marmelo letter to Ms. Martinez, Human Relations Representative dated 2–22–88).

In the fall of 1985 defendant Sherman chose to use the civil service exam method to fill the vacant supervisor positions despite the personnel/affirmative action officer Frank Marmelo's ("Marmelo") suggestion that he open up the process by using the promotion without exam method. (Marmelo depo. pp. 72–74, 85–87). During this time the DCAO had in place an affirmative action/equal employment policy.

In November of 1985 the civil service exam was administered for the position of supervisor; the top three scores were all 108s. Under the rule of three anyone who scored below 108 was ineligible for an interview. Although black employees applied for the Supervisor positions, including Clark, none were interviewed, all having scored below 108 on the exam. (Civil Service Commission Certification of Eligibles dated 11–15–85). Clark had scored an 84. All three positions were filled by white candidates who scored 108. Clark's evidence that personnel officer Marmelo gave the civil service list of eligibles

Marmelo The Personnel/Affirmative Action Officer at the DCAO

Montgomery The District Manager for the DPW for the Area including the DCAO from November 1987 until August of 1991. Her superior is the Area Manager

Rich Bragg's reviewing officer

Shelton President of the Chester County NAACP

Sherman The Executive Director of the DCAO from the summer of 1982 until the fall of 1989.

to Sherman, and that Sherman was aware of the race of the people within his office supports the position that Sherman was aware that no black applicant had scored a 108 on the civil service exam. (Sherman depo. p. 96; Marmelo depo. pp. 93–94).

In January of 1987 there were three more vacancies for Supervisor positions and again Sherman elected to use the civil service exam method. Once more the top three scores were 108 and under the rule of three anyone who scored below 108 was ineligible for an interview. Again no black applicant, including Clark[2], had scored 108, and none were interviewed for the positions. (Civil Service Certification of Eligibles dated 2-2-87). All three positions were again filled by white candidates who had scored 108 on the civil service exam. Clark's evidence again supports the position that Sherman was aware that no blacks had scored 108. (Sherman depo. p. 96; Marmelo depo. pp. 93–94).

On February 24, 1987, Clark filed her first claim of racial discrimination with the Pennsylvania Human Relations Committee ("PHRC") against the DPW, DCBA, Graves, and Sherman based on failure to promote. Although there was a space on the complaint for her to fill in if she was asserting a continuing violation Clark did not mark it as a continuing violation. Three weeks later Clark filed a formal complaint with the DPW's Bureau of Civil Rights Compliance. Although she had previously been friendly with defendant Sherman, after she filed her complaint he no longer spoke to her (Plaintiff's Exh. 22, Clark depo. p. 480), and Helen Wilson, Clark's manager and the superior of her immediate supervisor John Bragg ("Bragg"), on more than one occasion told Bragg that she didn't think that Clark should be filing complaints and creating problems. (Bragg depo. pp. 106–107).

In March of 1987 John Shelton, the President of the Chester County NAACP, contacted Sherman to request a meeting to discuss Clark's charges of discrimination. (Letter from C. Horsey to Sherman). During that same month defendant Sherman said to Mar-

melo in reference to Clark "I guess the colors are changing to fast for her." (Marmelo Civil Service Commission testimony pp. 44–45). Clark interprets this as a reference to the fact that while two of the six Supervisors who had left since 1985 were black, all of the applicants who filled the vacancies were white.

On April 2, 1987, Sherman, at a meeting with John Shelton, Clark, and Marmelo rearticulated his position that the civil service exam method was an objective means of filling vacancies. (Clark depo. pp. 314–322, 336–337). At this meeting Marmelo confirmed that Sherman had made the statement regarding the "changing colors" at the DCAO. (Clark depo. pp. 326, 329; Marmelo depo. pp. 140–142).

The next day, April 3, 1987, Sherman held a meeting where black employees asserted that they were denied equal opportunity in promotions. In response to these complaints Sherman reiterated his view that the exam method was an objective way to decide promotions, and that black employees should continue to take the exam. (Clark depo. pp. 354–356, 359).

In June of 1987 Sherman posted vacancies for two more supervisor positions. This time, however, he chose to fill them through the use of the promotion without exam method as well as through the civil service exam method. (Civil Service Commission Adjudication). As the personnel officer, Marmelo prepared and gave to Sherman a list of relatively equal candidates for the promotions. The list was determined by giving candidates points for seniority and meritorious service. Clark was ranked second out of fourteen on this list. (Civil Service Commission Adjudication ¶ 8).

John Shelton met with Graves on June 23, 1987 about whether Sherman would be involved in the promotion decisions. During this conversation Graves assured him that Sherman would not be involved in the decisions. (Shelton direct testimony at Civil Service Commission hearing, pp. 128–129; Let-

---

**2.** Clark did not retake the civil service exam, instead she used her previous score of 84 for this second round of promotions.

ter from John Shelton to John White). After the meeting John Shelton sent a letter to the DPW Secretary John White, requesting that Graves also not be directly involved in deciding who would be promoted. (Shelton Letter to John White dated 9–11–87). Clark provides evidence that Graves became aware of this letter. (Graves depo. p. 128).

In September of 1987, two weeks prior to Clark's interview for the promotion, Betty Emmi, a supervisor in the DCAO, physically struck Clark. (Clark depo. pp. 421, 426–327).

Ultimately the panel for Clark's interview for the promotion was comprised of Sherman, Graves, and Mr. Ted Ellis, a party not involved in the litigation. As was the norm there were proctors in the room during the interview. However, Graves decided not to have Marmelo proctor the interview, which he normally would do as the personnel/affirmative action officer, because she had heard from Sherman that Clark and Marmelo were having an affair. (Graves depo. pp. 161–162). Furthermore, although Clark had a right under the internal guidelines to be informed in advance of who would be on her interview panel she was not so informed. (Clark depo. pp. 78–479). When Clark saw that defendants Graves and Sherman were on the panel she asked them if they could be objective, they both replied that they could, and the interview began without incident. (Graves depo. p. 146; Clark depo. p. 459–460).

The panel rates the interviewees on a scale of one to four, with four being the highest, in three categories. The three categories are 1) judgment and problem solving, 2) communications, and 3) interpersonal relationships. (Clark Interview Tally Sheets and Evaluations). Sherman revised his interview scores for one of the interviewees, Jennifer Gilliam, increasing them in two categories. (Gilliam interview Tally Sheets and Evaluations). Interview scores can only be changed if there is at least a two point difference in a scoring category by another panel member. (Sherman depo. pp. 401–402). That was not the case, however, and Sherman cannot explain why he increased Gilliam's score. (Sherman depo. pp. 410–412). Clark was not selected for promotion. The two people chosen were Carolyn Ross (a white female) and Jennifer Gilliam (a black female). (Def.'s answers to Pl.'s first set of interrogatories ¶ 5).

Ross's interview score had been substantially higher than the rest and she was a clear choice for one of the positions. (Sherman depo. pp. 416–418). The increase in Gilliam's score resulted in a three way tie for the next highest score between three black women: Sylvia Dennis, Jennifer Gilliam and Clark. The panel decided to use education as a tie breaker and Jennifer Gilliam was selected. (Sherman depo. pp. 425–426). If they had used seniority instead of education to break the tie Clark would have received the position. (Promotion Without Exam Ranking Chart).

In October of 1987 Clark filed an amended charge of discrimination with the PHRC asserting that Sherman, Graves and the DPW had retaliated against her because she filed her original claim of discrimination. Her allegations of retaliation included the denial of promotion in September of 1987, being struck by supervisor Emmi, and being subjected to a hostile work environment. On October 19th Clark also filed a charge of discrimination with the Pennsylvania Civil Service Commission alleging that she was denied a promotion in September 1987 due to her race.

In November of 1987 all of the district managers were reassigned, and defendant Montgomery, who had been the district manager in Upper Darby, was reassigned to the Penn District where Clark worked.

Beginning in 1988 Clark was overloaded with cases (Clark Affidavit, ¶ 2) and in March she sent a complaint to the Bureau of Civil Rights Compliance focussing on the way work was distributed to caseworkers. On March 2, 1988 the civil service appeal of Clark's denial of promotion began, and that same month her unit was the first to undergo a food stamp audit.

In May of 1988 an anonymous letter was sent to the Office of the Inspector General ("OIG") accusing Clark of fraud, abuse of time, and abuse of phone privileges. (Letter to the OIG from "Anonymous" dated 5–3–88). Later that summer Clark's immediate supervisor, Bragg, submitted a positive evaluation

of her to Elizabeth Rich his designated reviewing officer. When Rich signed the review she added comments noting that she had requested documentation to support Bragg's "Exceeding Standard" review but that she had not received any, and that the evaluation had been signed by Bragg and Clark before it had been submitted to her for her signature. (Rich depo. pp. 132–138).

In August of 1988 Montgomery sent a memo to Sherman regarding errors found in eleven of Clark's cases through the audit process. (memo from Montgomery to Sherman dated 8–30–88). She also forwarded this memo to Rich and Bragg (memo from Montgomery to Rich and Bragg dated 9–22–88), who responded that the errors were normal for someone with that heavy a caseload.

In October 1988 the OIG investigated the anonymous charges against Clark. On October 27, 1988 Clark sent a letter to the PHRC alleging that the OIG investigation constituted retaliation and expressing her belief that it was perpetrated by Sherman. This was docketed as her third PHRC complaint. In January of 1989 the OIG closed its file having concluded that the allegations were unsubstantiated.

In November of 1988 Clark filed her fourth PHRC complaint alleging retaliation. This complaint focussed on Clark's recent performance evaluation and the comments added by Rich, as well as Montgomery's review of Clark's case files in connection with the audit. Clark alleges that that same month Montgomery asked Bragg to lower his evaluation of Clark, and threatened to have his evaluation lowered if he did not do so. (Bragg Civil Service Commission Complaint pp. 3–4).

On January 26, 1989, the Pennsylvania Civil Service Commission found that the DPW and Sherman had discriminated against Clark because of her race in the promotion process in early 1987 and ordered her promoted to supervisor at the next available vacancy. (Civil Service Commission Adjudication dated 1–26–89). Clark alleges that Sherman then dragged his feet to actually promote her. It was also in January that the Bureau of Civil Rights Compliance began a full scale review of the DCAO.

In April of 1989 Clark was promoted to Supervisor along with two other caseworkers. She was assigned to District Office ("D.O.") # 1 as she had requested, but was temporarily relocated to D.O. # 3. (Montgomery depo. pp. 375–378). Clark also presented evidence that Montgomery and Rich sanctioned insubordination from caseworkers under Clark, and engaged in other behavior which made Clark's job more difficult and undermined her authority. (Montgomery depo. pp. 237–266).

In May of 1989 the Civil Rights Compliance Report found problems in the DCAO. (Civil Rights Compliance Administrative Review). That month Marmelo was transferred to the Philadelphia office because of strained relations with Sherman. (Marmelo depo. Vol. II pp. 6–12). Marmelo appealed his transfer to the Civil Service Commission and was returned to the DCAO on December 12, 1989. (Marmelo depo. Vol. II, p. 33).

In July of 1989 Clark filed her fifth PHRC complaint alleging retaliation based on the delay in effectuating her promotion, and because of her temporary relocation to D.O. # 3. Three months later, in October of 1989, Sherman was reassigned to Harrisburg after an article about Clark's case was published in the Delaware County Times. Sherman worked in Harrisburg until his retirement in 1990.

One year later, in October of 1990 John Bragg, Clark's immediate supervisor, left his position, and Dot Laume, a manager within the DCAO, became Clark's immediate supervisor. Laume repeatedly questioned Clark about when and if she would be leaving the DCAO. (Clark depo. pp. 119–120). That same month Clark was the sole applicant for a vacancy in the position of County Trainer for Delaware County, and on October 30th she was awarded the position.

In August of 1991 defendant Montgomery retired. In January of 1992 defendant Jacobs loaned Clark to the Philadelphia County office to lead training for incoming caseworkers. (Norman depo. pp. 193–199). In February of that year there was an opportunity

for County Trainers to go to Harrisburg for computer training on the new computer system. The person who received the training would then come back and train the other supervisors and trainers in the new system. Kathy Eagan–Patrick was sent to receive this computer training in Harrisburg because Clark was already doing the training for incoming caseworkers (Norman depo. pp. 193–199). Clark alleges that Jacobs sent her to the Philadelphia County office purposely so that she would be unavailable for the computer training.

Because Eagan–Patrick had received the training in Harrisburg she trained the supervisors under Clark in the computer system instead of Clark. Eagan–Patrick then finished the training of the incoming caseworkers that Clark had been working on during the computer training in Harrisburg. (Norman depo. pp. 193–207).

In 1993 Clark received an anonymous phone call saying "you're going to lose your job, nigger." Clark reported the call to management, but no action was taken to discover who made the call. (Clark depo. pp. 733–734). On March 16, 1993 Clark filed suit in Federal Court in the Eastern District of Pennsylvania claiming violations of Title VII, the PHRA, and 42 U.S.C. § 1983 (Pl.'s Complaint).

The following are undated events which Clark relies upon in her complaint: she was locked out of her office many times (Clark depo. pp. 734–735) rumors were spread that she had had affairs with both Marmelo and Bragg (Bragg depo. p. 109; Graves depo. pp. 161–162), a supervisor had a whip mounted on her wall in her office for approximately six years despite complaints that it was offensive (Clark depo. pp. 661–664), and only minority caseworkers were assigned to the housing projects (Clark depo. pp. 729–730).

The procedural history of Clark's filing of her administrative complaints is as follows:

—February 24, 1987: Clark filed her first PHRC complaint based on discrimination;

—October 9, 1987: Clark filed her second PHRC complaint based on discrimination and retaliation in the promotions in the autumn of 1987;

—October 27, 1988: Clark filed her third PHRC complaint based on retaliation, in particular alleging that Sherman perpetrated the OIG investigation;

—January 4, 1990: Clark was sent a right to sue letter from the EEOC for her October 27, 1988 complaint;

—November 1, 1988: Clark filed her fourth PHRC claim based on retaliation;

—July 7, 1989: Clark filed her fifth PHRC complaint based on retaliation, in particular alleging that Sherman delayed the implementation of her CSC ordered promotion to supervisor;

—November 11, 1990: Clark was sent a right to sue letter from the EEOC for her July 7, 1988 complaint;

—February 2, 1993: Clark was sent a right to sue letter from the EEOC on her first, second, and fourth complaints;

—March 16, 1993: Clark filed this lawsuit in Federal Court within ninety days of being sent this last right to sue letter.

## II. Clark's motion to amend her complaint to request damages from 1985 forward instead of from 1987

Clark asks to amend her complaint to assert her claim of disparate impact from 1985 forward instead of from 1987. The consequence of this is that if she wins at trial Clark could receive back pay from 1985–1989 as opposed to from 1987–1989.

It is within the discretion of the court to grant or deny a motion to amend, *Lewis v. Curtis,* 671 F.2d 779, 783 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Although generally leave to amend pleadings "shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), reasons to deny leave to amend include the following: undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of granting the amendment. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993). Defendants argue that Clark's

motion for leave to amend her complaint should be denied because of the futility of granting the amendment.

■ The futility of the amendment turns on whether Clark has established a continuing violation. Title VII, requires a plaintiff to file a complaint with the EEOC within 180 days after the alleged act of discrimination. If, however, the plaintiff initially filed a complaint with a state or local agency with authority to adjudicate the claim, such as the PHRC, he or she is instead allotted 300 days from the date of the alleged discrimination within which to file a charge of employment discrimination with the EEOC. *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 (3d Cir.1994); 42 U.S.C. § 2000e–5(e).

Clark's proposed amended disparate impact claim is based on the promotional decisions made in late 1985 and in January of 1987. Clark filed her first claim of discrimination with the PHRC on February 24, 1987. Although there was a space on the complaint for her to fill in if she was asserting a continuing violation Clark did not mark it as a continuing violation. Therefore, her complaint on its face was based solely on the January 1987 denial of promotion. Any claim based on the 1985 denial of promotion would, therefore, be untimely because it was not filed with the EEOC within 300 days after the alleged unlawful practice occurred in 1985. If Clark's complaint had included a claim based on the 1985 promotions I would be required to dismiss it for her failure to file a complaint with the EEOC within the filing time, thus making her amendment futile.

■ However, "a claim of discrimination may include challenges to incidents which occurred outside the statutory time limitations of Title VII if the various acts constitute a 'continuing pattern of discrimination.'" *Martin v. Nannie and the Newborns,* 3 F.3d 1410, 1415 (10th Cir.1993), quoting *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1543 (10th Cir.1987). Under the continuing violation theory there must be at least one instance of discrimination within the filing period, and the earlier acts must be part of continuing policy or practice that includes acts within the filing period. *Martin v. Nan-*

*nie & the Newborns,* 3 F.3d at 1415. If a continuing violation is alleged then the plaintiff must file an administrative complaint with the EEOC within the statutory time period from the last discriminatory event. *Miller v. Aluminum Co. of America,* 679 F.Supp. 495, 499 (W.D.Pa.1988), citing *Bronze Shields, Inc. v. New Jersey Dep't. of Civil Service,* 667 F.2d 1074, 1081 (3d Cir. 1981).

■ A plaintiff may not assert a continuing violation based on past isolated instances of discrimination, even where the effects persevere into the present. *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *EEOC v. Westinghouse Electric Corp.,* 725 F.2d 211 (3d Cir.1983). Therefore, for Clark to prevail she must show more than the occurrence of isolated or sporadic acts of discrimination. *Jewett v. International Telephone and Telegraph Corp.,* 653 F.2d 89 (3d Cir.1981). Other circuits which have decided cases of continuing violations have looked towards the following factors to determine whether a continuing violation exists: "i) subject matter—whether the violations constitute the same type of discrimination; ii) frequency; and iii) permanence—whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Martin v. Nannie and the Newborns Inc.,* 3 F.3d at 1415, citing *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971, 981 (5th Cir.1983), *cert. denied,* 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986).

■ I find that in light of these factors the two denials of promotions in 1985 and 1987 under the Civil Service Exam method were separate and distinct instances of promotions and cannot be grouped together as a continuing violation. *See West v. Philadelphia Electric Co.,* 45 F.3d 744 (3d Cir.1995). Although the violations were of the same nature, namely the use of the civil service exam method to determine promotions, they occurred only twice during her 5 year tenure at the DCAO before she filed her first discrimination claim. Furthermore, Clark had notice of the first

instance of alleged discrimination in 1985 when she was not selected for an interview for a promotion to supervisor. She was aware of the method being used to determine promotions and could have filed a claim at that time.

When the Civil Service Exam method was used again in 1987 and Clark was passed over for an interview a second time, she did file a complaint within the limitations period and that claim is properly before me now. Because Clark did not mark this as a continuing violation on her 1987 complaint, and because I independently find that this was not a continuing violation I will deny Clark's motion to amend her complaint to assert a cause of action from 1985 onward as futile.

### III. Summary Judgment Standard

 In order to obtain relief on a summary judgment motion the moving party must establish that there is no genuine issue of material fact which remains in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue exists if there is sufficient evidence for a reasonable jury to find for the non-movant, and an issue is material if it could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In a motion for summary judgment the evidence must be viewed in a light most favorable to the non-moving party, *Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Investment,* 951 F.2d 1399 (3d Cir.1991), and the court must give the non-moving party the benefit of all reasonable inferences in reviewing the record. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637 (3d Cir. 1993). However, the non-movant cannot satisfy her burden by relying on unsupported allegations in her pleadings or brief, *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990).

### IV. Plaintiff's Motion for Partial Summary Judgment on the Issue of Disparate Impact

 Clark moves for summary judgment on her claim of disparate impact from the use of the civil service exam method in January of 1987. In order to make a prima facie case of discrimination by disparate impact Clark must show the following:

1) The use of a facially neutral hiring criteria has produced a significantly disparate impact on employment opportunities for a protected class of people. If Clark can show this, then

2) the burden shifts to defendants to show a business justification for the use of the test. If defendants can show this Clark can still make out a prima facie case of disparate impact if she can show that

3) an alternative test was available which would achieve the same business ends with less of a racial impact and defendants refused to use it.

*Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657–658, 109 S.Ct. 2115, 2124–2125, 104 L.Ed.2d 733 (1989).

Clark alleges that the use of the civil service exam method of promotion had a disparate impact on black employees and that she has made out a prima facie case through the use of statistical evidence. The parties agree that the Fisher's Exact Test is the appropriate test to determine whether the civil service exam method had a disparate impact on black workers at the DCAO. The parties further agree that results of the Fisher's Exact Test are not affected by the size of the sample pool, and that under the Fisher's Exact Test a standard deviation of 2.0 or more, or a probability of .05 or less, is a statistically significant result. Clark has met the first requirement under *Wards Cove* by showing through statistical evidence that the use of the civil service exam method of promotion had an adverse impact on black employees.

Both parties agree that in the civil service exam method under the Fisher's Exact Test the standard deviation was 2.34. Because this is greater than a standard deviation of 2.0 this result is statistically significant. The parties further agree that under the Fisher's Exact tests there was a .0194 probability that the disparity in selection rates between black and white employees who had passed the exam was due to random chance, (De Cani affidavit, ¶ 14), because this is less than prob-

ability of .05, this is a statistically significant result sufficient to put forth a prima facie case on summary judgment.

The burden then shifts to defendants to show that the use of the civil service exam method is job related or business justified. *Id.* For purposes of this summary judgment motion Clark concedes that the civil service exam method of promotion was job related. Therefore, defendants have met their burden on this issue.

■ Clark, however, can still survive summary judgment if she can show that there was an alternative method available which the defendants refused to implement. *Id.* Clark has shown that there was an alternative method available which did not have a disparate impact on minority workers: the promotion without exam method subsequently used by defendants. However, the question is whether defendant Sherman refused to implement this method. Sherman contends that he could not "refuse" to implement the alternative method because he was unaware that the method he had chosen to fill the vacancies had a disparate impact on black applicants. There is a genuine issue of material fact as to whether Sherman was aware of the disparate impact caused by the use of the exam method prior to the 1987 promotions. Clark offers evidence that Sherman asked to look at the list of eligibles, and that therefore he knew whether only whites had achieved a score of 108. I find that this is a relevant and open issue at this time, and that defendants have presented enough evidence to survive a motion for summary judgment on this issue.

## V. Defendants' Motion for Summary Judgment

### A. Summary Judgment on the Title VII Violations

#### 1. Disparate Impact

Defendants move for summary judgment on Clark's claim of disparate impact. As I have already discussed, (see Section IV above, Plaintiff Clark's Motion for Partial Summary Judgment on the Issue of Disparate Impact), Clark has established a prima facie case of disparate impact, therefore, I will deny summary judgment on this issue.

#### 2. Disparate Treatment

■ Defendants move for summary judgment on Clark's claims of intentional discrimination (disparate treatment). In order for Clark to make out a claim of disparate treatment she must establish the following four factors: 1) that she is black; 2) that she was qualified for the position; 3) that she was rejected for the position; and 4) that the position remained open and was filled by a white person. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see St. Mary's Honor Center v. Hicks*, —. U.S. —, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If Clark succeeds in putting forth a prima facie case the burden of production shifts to defendants to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (1973). The burden of production then returns to the plaintiff to show by a preponderance of the evidence that the employer's explanation is pretextual. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).

■ "If the plaintiff has pointed to evidence sufficient[ ] to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Fuentes*, 32 F.3d at 764. Therefore, if Clark's prima facie case adequately discredits defendants' proffered reasons she need not rebut their proffered legitimate reasons with additional evidence, but may rest on her prima facie case to survive summary judgment.

■ Clark has met her burdens in regard to the January 1987 promotions. Clark is a black woman who was qualified for the Supervisor position. She applied and was rejected for the open Supervisor positions, and these positions were filled by three white candidates. Defendants then rebut this prima facie case by stating that Sherman did not intend to discriminate against the black applicants, but rather that the use of the civil service exam method eliminated the black candidates. Clark has presented evidence

sufficient to discredit defendants' proffered reasons in the form of Marmelo's testimony that Sherman looked at the list of eligibles, and that he would have been aware from the list that no black applicants were eligible for interviews under the civil service exam method. This successfully discredits defendants' proffered reasons because one could believe that Sherman chose to use the civil service exam method with the knowledge that it would eliminate the black applicants before the interview stage. Therefore, Clark's claim of discrimination based on the January 1987 promotions can survive summary judgment.

■ However, Clark cannot survive summary judgment on her claim for discrimination based on the promotions in the fall of 1987. Although Clark is a black woman who was qualified and rejected for the positions, Jennifer Gilliam, who was chosen for one of the promotions instead of Clark, is also a black woman. The fact that Gilliam is also black does not necessarily foreclose the possibility that Clark was discriminated against because of her race, but Clark has not provided any evidence which is capable of being admissible at trial to support her claim that she was discriminated against on the basis of her race on any other grounds in the promotions in the fall of 1987.[3] Therefore, I will deny Defendants' motion for summary judgment as to the promotions in January of 1987, but I will grant defendants' motion for summary judgment as to Clark's claim of intentional discrimination in the autumn of 1987 promotions.

**3. Retaliation**

■ In order to make out a prima facie case of retaliation Clark must show the following: 1) that she engaged in protected conduct; 2) that her employer took adverse action against her; and 3) a causal link between the protected conduct and the adverse action. *Jalil v. Avdel Corp.*, 873 F.2d 701,

708 (3d Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). Clark engaged in protected conduct when she filed complaints with the PHRC and the EEOC. *Jalil*, 873 F.2d at 708; *Oliver v. Bell Atlantic Corp.*, 1994 WL 315829 (E.D.Pa.). What is at question is whether any adverse action was taken against Clark, whether there was a causal relationship between her protected conduct and any such adverse action, and whether any of Clark's claims of retaliation are time barred.

■ As for adverse action taken against Clark, she has alleged a pattern of retaliation since 1987 when she filed her first PHRC complaint. Since then she has alleged that Sherman stopped talking with her, she was denied a promotion in September of 1987, she was struck by a supervisor in September of 1987, she was overloaded with cases, she was investigated by the OIG in 1988, that another supervisor asked her direct supervisor to lower his evaluation of her, that defendant Sherman delayed her CSC ordered promotion to Supervisor, she was denied a computer training opportunity, and that false rumors were spread about her having an affair with both the affirmative action officer and her direct supervisor Bragg. Although adverse action by an employer may typically take the form of termination, demotion, or transfer, it is not limited to these actions. *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir.1987) (finding lateral transfer with no loss in salary or benefits adverse action by employer); *Passer v. American Chemical Society*, 935 F.2d 322 (D.C.Cir.1991) (canceling a public symposium in honor of employee because he filed an age discrimination claim against his employer amounts to adverse action by the employer); *Hines v. Southeastern Pa. Transp. Auth.*, 1992 WL 435826 at *4 (E.D.Pa.1992) ("adverse action can include harassment"). The definition of an adverse employment action under section 704(a) of Title VII includes

---

**3.** Clark provided her own deposition testimony, which is hearsay evidence, to support her theory that Gilliam was given the promotion because she was threatening to sue the DPW for discrimination. Although hearsay evidence could be sufficient to survive summary judgment, *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware*

*Co., Inc.*, 998 F.2d 1224, 1234 n. 9 (3d Cir.1993), because she could produce Gilliam to testify to this at trial, in this case Gilliam denied under oath in her deposition that she was planning to or had threatened to file suit against the DPW. Therefore, Clark cannot produce this testimony in an admissible form at trial.

"any action which already has impaired or which might impair the employee in future employment situations." *Nelson v. Upsala*, 51 F.3d 383, 386 (3d Cir.1995). Under this definition I find that the actions set out by Clark amount to adverse action by her employer.

 Next it must be determined whether there is a causal relationship between Clark's PHRC and EEOC filings and the adverse actions taken against her by her employer. Although a causal relationship may be shown by proximity in time between the protected conduct and the adverse action, *Burrus v. United Tele. Co.*, 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982), a lapse in time between the two does not require a finding that there is no causal relationship. *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir.1993) ("the mere passage of time is not legally conclusive proof against retaliation"); *see Cuffy v. Texaco Refining & Marketing Co.*, 684 F.Supp. 87 (D.Del.1988) (finding retaliation where adverse action occurred almost 2 years after the protected conduct, but during pendency of EEOC investigation). I find that this case is similar to *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892 (3d Cir.1993), in that Clark has alleged a pattern of harassment that comprises the adverse action taken by her employer. This pattern of harassment began when she filed her first complaints with the PHRC and the EEOC. Therefore, I find that Clark has met the requirements for a prima facie case of retaliation.

 The shifting burdens of proof established by *McDonnell Douglas* regarding intentional discrimination, also apply to a claim of retaliation. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727 (9th Cir.1986); *Cuffy v. Texaco Refining & Marketing Co.*, 684 F.Supp. 87 (D.Del.1988). Therefore, once Clark has established a prima facie case of retaliation the burden of production shifts to defendants to articulate a legitimate nondiscriminatory reason for these actions. Although defendants can articulate legitimate nondiscriminatory reasons for some of their actions Clark survives summary judgment by

showing that the legitimate reasons offered by defendants were merely a pretext for retaliation. I find that Clark's evidence, such as Sherman's changing of Gilliam's interview scores without reason, is sufficient to discredit defendants' proffered reasons and to survive summary judgment. *Fuentes*, 32 F.3d 759 (3d Cir.1994).

 Defendants, however, assert that two of Clark's claims of retaliation are untimely, and are, therefore, barred by the statute of limitations. "Section 2000e–5(f)(1) provides that if the EEOC dismisses a charge or takes no action within a specified period of time that it shall notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge." *Robinson v. American International Adjustment Co., Inc.*, 1990 WL 100309, *3 (D.N.J.1990) (internal quotation marks omitted). This ninety day filing period after the receipt of a right to sue letter from the EEOC is a statute of limitations for filing Title VII claims in federal court, and is not a jurisdictional requirement. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *Way v. Mueller Brass Co.*, 840 F.2d 303 (5th Cir. 1988); *Anderson v. Unisys Corp.*, 47 F.3d 302 (8th Cir.1995); *Gooding v. Warner–Lambert Co.*, 744 F.2d 354 (3d Cir.1984).

Clark received a right to sue letter from the EEOC on January 4, 1990 for the complaint based on the OIG investigation, and on November 14, 1990 on her claim regarding Sherman's delay in implementing her promotion. She filed suit in federal court on March 16, 1993, after ninety days had passed on either right to sue letter.

The only applicable opinion I could find that addresses this precise issue is *Brown v. Continental Can Co.*, 765 F.2d 810 (9th Cir. 1985); I will follow its holding. In *Brown*, plaintiff, a black male employee, brought suit against his former employer. Plaintiff had first filed a complaint with the EEOC in July of 1977 ("first charge") while he was still employed by defendant alleging that he had been removed from a training program because of his race. He filed a second charge

against defendant in November of 1978 ("second charge") after he was terminated, alleging discrimination in his termination. Plaintiff was issued a right to sue letter on January 26, 1983, on his second charge. He did not file a complaint in federal court within ninety days of the receipt of this letter. On November 13, 1983, plaintiff was issued a right to sue letter on his first charge, and he timely filed suit in federal court. Defendant moved to dismiss plaintiff's claim based on his termination for untimeliness. The Ninth Circuit held that plaintiff could pursue both claims, despite his failure to file within ninety days of receipt of the right to sue letter on his second charge, because the second charge was "like or reasonably related to the allegations of the [first] EEOC charge, including new acts occurring during pendency of the charge before the EEOC." *Brown*, 765 F.2d at 813, quoting *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973). Therefore, plaintiff's second charge was timely because his discriminatory termination was reasonably related to the earlier discrimination which formed the basis of his first charge, and it occurred during the pendency of his first charge before the EEOC. *Brown*, 765 F.2d at 813.

 Similarly under Third Circuit law when a discriminatory act is reasonably related to earlier discrimination which formed the basis of an initial complaint, the subsequent discriminatory action is encompassed within the original complaint. *Waiters v. J.L.G. Parsons, II*, 729 F.2d 233 (3d Cir. 1984); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394 (3d Cir.1976). Clark's action is timely because the perpetration of the OIG investigation and the delay in promoting her to supervisor constitute new acts of retaliation which are reasonably related to and which occurred during the pendency of her earlier charges before the EEOC. *Brown*, 765 F.2d at 813; *See also Babcock v. Frank*, 729 F.Supp. 279 (S.D.N.Y.1990). Therefore, the issuance of the two earlier right to sue letters by the EEOC in January and November of 1990 does not preclude Clark from alleging the incidents of retaliation which formed the basis of those two complaints in this action.

 Generally, if a plaintiff receives a right to sue letter from the EEOC and does not file suit in federal court based upon those claims within ninety days the claims are then time barred. *See Ford v. Temple Hospital*, 790 F.2d 342 (3d Cir.1986); *Scholar v. Pacific Bell*, 963 F.2d 264 (9th Cir.1992). However, Clark did file suit within ninety days of receipt of the February 2, 1993 right to sue letter issued on her earlier complaints.

A number of courts have ruled that if a claimant receives a right to sue letter on a first filed complaint with the EEOC and does not file within ninety days, a right to sue letter on a second EEOC complaint will not revive the first complaint. *See Ivy v. Meridian Coca-Cola Bottling Co.*, 108 F.R.D. 118 (S.D.Miss.1985); *Brown v. Walt Disney World Co.*, 805 F.Supp. 1554 (M.D.Fla.1992). Other courts have held that a plaintiff cannot evade the ninety day statute of limitations by filing subsequent EEOC complaints based on the same facts and then timely filing after receiving a second right to sue letter. *Soso Liang Lo v. Pan American World Airways, Inc.*, 787 F.2d 827 (2d Cir.1986). However, neither of those principles, based upon a bootstrapping attempt, are applicable here and I will deny defendants' motion for summary judgment regarding all of Clark's claims for retaliation.

### 4. Hostile Environment

 Title VII of the Civil Rights Act of 1964 protects against requiring people to work in a discriminatorily hostile or abusive environment. This is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). In order to determine whether a work environment is hostile one must look at all of the circumstances. *Id.*, ——, 114 S.Ct. at 371.

 To bring an actionable claim under Title VII because of a hostile work environment a plaintiff must show by the totality of the circumstances a hostile environment

which is severe enough to affect the psychological stability of a minority employee. *Andrews v. City of Philadelphia, et al.,* 895 F.2d 1469 (3d Cir.1990), citing *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989). The Third Circuit has set forth the five elements needed to establish a hostile environment claim as follows:

1) the employees suffered intentional discrimination because of their race;

2) the discrimination was regular and pervasive

3) the discrimination detrimentally affected the plaintiff;

4) the discrimination would detrimentally affect a reasonable person in the same position; and

5) the existence of respondeat superior liability.

*Andrews,* 895 F.2d 1469; *Spain v. Gallegos,* 26 F.3d 439 (3d Cir.1994). These elements include both a subjective (3) and an objective (4) factor which ensures that the particular plaintiff is entitled to relief and avoids the problem of a hypersensitive employee. *Andrews,* 895 F.2d at 1483.

Clark alleges that the work environment at the DCAO was affected in the following ways: 1) In 1985 and January of 1987 Sherman purposely decided to use the Civil Service Exam method because he knew that using this method would eliminate any black applicants from the interview process; 2) black caseworkers were assigned to the tougher neighborhoods, while white case workers were not; 3) black employees were held to a different standard—when white employees had trouble with their supervisors they were transferred, while black employees who had trouble with their supervisors were told to work it out; 4) a supervisor displayed a whip on her wall which was not removed even after it was brought to her attention that it was offensive. I find that this is enough to survive summary judgment on this element of her claim.

Second, Clark must show that the discrimination was pervasive and regular. In determining that Clark's claim can withstand summary judgment on this element I note that although not all of these occurrences continued during her entire time at DCAO, together they were continuous during the time in question.

Third, the discrimination must have been injurious to Clark. She has asserted that she was twice passed over for promotion, that she was referred to as a troublemaker by management, that rumors were spread that she was having affairs both with Marmelo and her immediate supervisor Bragg, that Marmelo was excluded from her 1987 interview for promotion because Graves and Sherman thought that she was having an affair with him, that she was purposely loaned to another department in order to deny her computer training in Harrisburg so that a white employee could instead be trained, and that she was repeatedly asked by her supervisors when she would be leaving the DCAO. Clark has sufficiently alleged that she was detrimentally affected by the discrimination. *Spain,* 26 F.3d at 449 (3d Cir.1994).

Fourth, Clark must show that a reasonable person in her position would have been detrimentally affected by this discrimination. *Id.* at 449. Clark has alleged that she was passed over for promotion, that she was labelled a troublemaker by management and was repeatedly asked when she would be leaving her job at the DCAO. She has sufficiently created a question of fact as to whether a reasonable person in her position would have been detrimentally affected by these conditions.

Last, Clark must show the existence of respondeat superior liability. *Id.* at 450. I must look to agency principles for guidance as to whether there is respondeat superior liability. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). Under those principles

Liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989); See *Hicks v. Gates Rubber* [*Co.,* 833 F.2d 1406] at 1418 [ (10th Cir.1987) ]. Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a ... hostile environment and failed to take prompt and adequate

remedial action, the employer will be liable. *Katz v. Dole,* 709 F.2d [251] at 255 [(4th Cir.1983)]. (internal quotation marks omitted).

*Andrews,* 895 F.2d at 1486. Clark has sufficiently alleged that management was aware of the problem here, in fact, management was often the cause of her allegations. For example, the managers decided who was assigned to which caseloads, the executive director and the managers decide what to do when a caseworker did not get along with his or her supervisor, and one of the supervisors displayed the whip in her office. If evidence is shown that a supervisory employee himself or herself created the hostile environment, a fortiori the requirement of respondeat superior is shown. *Cf. Andrews,* 895 F.2d 1469. Therefore, I find that Clark's claim for discrimination based on a hostile environment can survive summary judgment.

## B. Individual Liability under Title VII

■ Clark has sued a number of her supervisors in both their individual and official capacities. Defendants assert that individuals cannot be held liable in their individual capacity under Title VII or the PHRA. Neither the United States Supreme Court, nor the Third Circuit has considered this issue and there is no consensus on this issue among the circuits that have addressed it, or even within the Eastern District of Pennsylvania. I find more persuasive the opinions that hold that there is no individual liability under Title VII or the PHRA, and I will grant defendants' motion for summary judgment on this issue.

The statutory liability scheme of Title VII supports the finding that defendants cannot be held individually liable. Title VII limits liability to employers with fifteen or more employees, and adjusts the amount of damages for which employers can be held liable according to the number of employees of the company. 42 U.S.C. § 1981a(b)(3)(A–D). Congress limited Title VII liability to companies with fifteen or more employees "... in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims. If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees." *Miller v. Maxwell's International Inc.,* 991 F.2d 583, 587 (9th Cir.1993), *See Caplan v. Fellheimer Eichen Braverman & Kaskey,* No. 94–7506, —— F.Supp. —— (E.D.Pa. April 24, 1995).

■ Furthermore, Title VII is aimed at employers, not individuals. "Congress designed the remedial measures in these statutes to serve as a "spur or catalyst" to cause employers to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of discrimination." *McKennon v. Nashville Banner Publishing Co.,* —— U.S. ——, ——, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995), quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–418, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975). The purpose of Title VII is to make employers more aware of discriminatory practices within their own corporation, and to encourage them to eliminate those practices; it is not aimed at the individual but rather at the employer.

Some courts that find individual liability under Title VII rely on the 1991 amendments which provide for compensatory and punitive damages. They reason that prior to the 1991 amendments "courts were loathe to impose liability under Title VII on individuals because the remedies were of a sort that individuals were ill-equipped to provide, e.g., reinstatement and back pay." *Verde v. City of Philadelphia,* 862 F.Supp. 1329, 1333 (E.D.Pa.1994). However, as noted above, because Congress in the 1991 amendments limited damages according to the size of the company, and exempted companies with fewer than fifteen employees from Title VII liability entirely, it would be inconsistent to impose liability on individuals under Title VII.

■ Although courts which impose liability on individuals under Title VII often refer to the inclusion of "agents" of the employer within the definition of employer, *See* 42 U.S.C. § 2000e(b); *Domm v. Jersey Printing Co.,* 871 F.Supp. 732 (D.N.J.1994); *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir. 1989); *Shager v. Upjohn Co.,* 913 F.2d 398,

404 (7th Cir.1990); *Bishop v. Okidata*, 864 F.Supp. 416 (D.N.J.1994); *Doe v. William Shapiro, Esquire, P.C.*, 852 F.Supp. 1246 (E.D.Pa.1994), I find that the purpose for including agents within the definition of employer was to ensure that employers were subject to the rule of respondeat superior. *Miller*, 991 F.2d 583; *Grant v. Lone Star Company*, 21 F.3d 649 (5th Cir.1994) (finding that supervisors in private companies are not employers and are therefore not liable for damages under Title VII); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 882 F.Supp. 1529 (E.D.Pa.1995); *Barb v. Miles, Inc.*, 861 F.Supp. 356, 359 (W.D.Pa.1994).

For the above stated reasons I will grant defendants' motion and I will dismiss the claims against the individual defendants in their individual capacities. I will grant summary judgment for the individual defendants in their individual capacities only and the case will go forward against the individual defendants in their official capacities as the defendants have conceded this issue.

"The courts have uniformly held that the PHRA should be interpreted consistent with Title VII." *Barb*, 861 F.Supp. at 359 n. 1 (W.D.Pa.1994); *Violanti v. Emery Worldwide A–CF Company*, 847 F.Supp. 1251, 1257 (M.D.Pa.1994). Therefore, although I analyzed individual liability under Title VII the same analysis holds true for Clark's PHRA claims and I will grant summary judgment to the defendants on the issue of individual liability under both Title VII and the PHRA.

## C. The PHRA Claims

 Defendants raise an Eleventh Amendment defense to Clark's PHRA claims against the DPW, the DCBA and the individual defendants in their official capacities. States are immune from suits based on State law claims in federal court under Eleventh Amendment protection. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). County Boards of Assistance in Pennsylvania are arms of the state and are, therefore, entitled to Eleventh Amendment immunity. *Degregorio v. O'Bannon*, 86 F.R.D. 109, 118

(E.D.Pa.1980). The only exceptions to Eleventh Amendment immunity are 1) when Congress provides for suits against the States to enforce the provisions of the Fourteenth Amendment, *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), or 2) when States themselves waive sovereign immunity under the Eleventh Amendment, *See Pennhurst*, 465 U.S. at 99, 104 S.Ct. at 907 (1984). A State's waiver of sovereign immunity under the Eleventh Amendment must be unequivocally stated, *id* at 99, 104 S.Ct. at 907, as must Congressional intent to "overturn the constitutionally guaranteed immunity of the several States." *Quern v. Jordan*, 440 U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979).

 Although the Commonwealth of Pennsylvania has legislated in the area of employment discrimination, *See* 43 Pa.Cons. Stat.Ann. § 951, *et seq.*, it has not expressly waived its Eleventh Amendment immunity in that area. Therefore, Clark's PHRA claims against the DPW and the DCBA cannot be litigated in federal court. Furthermore, the PHRA claims against the individual defendants in their official capacities cannot go forward in federal court because these claims are effectively against the state. *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

Defendants also move for summary judgment on Clark's PHRA claims based on the argument that they are untimely. Because I have found that these claims cannot go forward in federal court against the DPW, the DCBA and the individual defendants in their official capacities because of the Eleventh Amendment, and because I have decided above that the individual defendants cannot be held liable in their individual capacities under the PHRA I need not reach the issue of whether Clark's PHRA claims are untimely.

## D. § 1983 Claim against Defendant Jacobs

Defendants move for summary judgment on Clark's 42 U.S.C. § 1983 claim against defendant Jacobs. I have not addressed this issue in this opinion and the claim will either

be withdrawn by plaintiff or I will decide the issue in a subsequent order.

### E. Compensatory and Punitive Damages

■ Compensatory and punitive damages were made an available remedy under Title VII for intentional discrimination in the 1991 amendments. 42 U.S.C. § 1981a(b). However, the 1991 Amendments to Title VII are not retroactive. *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Linsalata v. Tri–State General Ins. Ltd.,* 1992 WL 392586 (E.D.Pa. 1992). Therefore, Clark is limited to compensatory and punitive damages for post November 21, 1991 intentional acts of discrimination. The post November 1991 acts alleged by Clark are that defendant Jacobs loaned her to the Philadelphia County Office so that Clark would be unavailable for the computer training in Harrisburg, and that only minority employees were assigned to the housing projects.

#### 1. Punitive damages

■ Punitive damages are permitted in Title VII cases, 42 U.S.C. § 1983 cases, and PHRA cases under Pennsylvania State law in certain circumstances. Defendants argue that punitive damages should not be allowed in this case on any of Clark's claims. I have granted summary judgment to defendants on Clark's PHRA claims against all defendants, therefore, I need not consider whether Clark may be entitled to punitive damages on her PHRA claims. As I have reserved decision as to Clark's 42 U.S.C. § 1983 claim until a later date I will not now decide whether she may be entitled to punitive damages on this claim. Therefore, I need only decide whether Clark can survive summary judgment on her claims for punitive damages under Title VII.

■ Punitive damages may be awarded if the defendants "engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of" the plaintiff. 42 U.S.C. § 1981a(b)(1). I find that Clark has presented evidence sufficient to survive summary

judgment on the issue of whether she may be eligible for punitive damages under Title VII.

### F. DCBA

■ Defendants move to have the DCBA dismissed as a defendant for lack of involvement in the events alleged by Clark. The DCBA enjoys Eleventh Amendment immunity because it is an arm of the State, *Degregorio v. O'Bannon,* 86 F.R.D. 109, 118 (E.D.Pa. 1980), and therefore, the PHRA claims against the DCBA are barred by the Eleventh Amendment (see section VI D defendants' motion for summary judgment on plaintiff's PHRA claims). Thus I will consider this motion only as to the remaining Title VII counts against it.

■ Defendants argue that although the DCBA is given significant responsibility on paper, in practice it did not play a role in the litigation at hand. Plaintiffs respond that 62 P.S. § 417 gives the DCBA the responsibility to ensure that the promotions made within its county are lawful. Therefore, even if defendant Sherman made these decisions on behalf of the DCBA, he was acting as its agent and under Title VII the DCBA is still liable. I will therefore, deny defendants motion to dismiss the DCBA as a party to this litigation.

### G. Intentional Infliction Of Emotional Distress

Clark has withdrawn her claim for intentional infliction of emotional distress.

### ORDER

**AND NOW,** this 4th day of May 1995, it is **ORDERED** that

1. Plaintiff's motion to amend her complaint is **DENIED.**

2. Plaintiff's motion for partial summary judgment is **DENIED.**

3. Defendants' motion for summary judgment on plaintiff's claims against the individual defendants in their individual capacity under Title VII and the PHRA is **GRANTED.**

4. Defendants' motion for summary judgment on plaintiff's Title VII claim of disparate impact is **DENIED.**

5. Defendants' motion for summary judgment on plaintiff's Title VII claim of disparate treatment for failure to promote in January of 1987 is **DENIED.** Defendants' motion for summary judgment on plaintiff's Title VII claim of disparate treatment for failure to promote in the autumn of 1987 is **GRANTED.**

6. Defendants' motion for summary judgment on plaintiff's Title VII claim for retaliation is **DENIED.**

7. Defendants' motion for summary judgment on plaintiff's Title VII claim of hostile work environment is **DENIED.**

8. Defendants' motion for summary judgment on plaintiff's PHRA claims against the Commonwealth of Pennsylvania Department of Welfare, the Delaware County Board of Assistance, and the individual defendants in their official capacities is **GRANTED.**

9. Defendants' motion to dismiss the Delaware County Board of Assistance as a defendant is **DENIED.**

10. Plaintiff's claims for compensatory and punitive damages under Title VII is limited to her claims based on conduct which occurred after November 21, 1991.

11. Ruling is deferred on the motion of defendants for summary judgment on plaintiff's 42 U.S.C. § 1983 claim against defendant Jacobs.